**Jordan Jay KING and Dorothy King, Plaintiffs-Appellants,**

v.

**KANSAS CITY SOUTHERN INDUSTRIES, INC., et al., Defendants-Appellees.**

**Nos. 74–1191, 74–1192.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 17, 1975.

Decided June 19, 1975.

Abraham L. Pomerantz, New York City, Harry Schulman, A. Bradley Eben, Lowell E. Sachnoff, Chicago, Ill., for plaintiffs-appellants.

Lynne E. McNown, Joan M. Hall, Edward Hatton, Chicago, Ill., Marvin Schwartz, New York City, Arthur Susman, Chicago, Ill., Landon H. Rowland, Kansas City, Mo., for defendants-appellees.

Before CLARK, Associate Justice,[*] and PELL and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

Jordan Jay King and Dorothy King, shareholders in Technology Funds, Inc., appeal orders denying them class action status and approving a settlement of all claims arising from the merger of Supervised Investors Services, Inc. and Kemperco, Inc. The Kings with Melvin Stoller (the Kings) brought this action as representatives of four mutual funds (the Funds); Technology Fund, Inc. (Technology), Balanced Income Fund, Inc. (Balanced), Supervised Investors Summit Fund, Inc. (Summit), and Supervised Investors Growth Fund, Inc. (Growth). Their complaint named as defendants Kansas City Southern Industries, Inc. (KCSI) and the principal shareholders and officers of Supervised Investors Services, Inc. (SIS), John Hawkinson, Russell Matthias, Courtenay Davis, John Porter, Jr., J. Milburn Smith and Chester Tripp.

The Kings claimed defendants violated Sections 15[1] and 20(a)[2] of the Investment Company Act of 1940, Sections 10(b)[3] and 14(a)[4] of the Securities Ex-

---

[*] Associate Justice Tom C. Clark of the Supreme Court of the United States (Retired) is sitting by designation.

1. 15 U.S.C. § 80a–15.

2. 15 U.S.C. § 80a–20(a).

3. 15 U.S.C. § 78j(b).

4. 15 U.S.C. § 78n(a).

change Act of 1934, Rule 10b–5[5] of the rules and regulations of the Securities and Exchange Commission, and their common law fiduciary obligations to the Funds and their shareholders. The plaintiffs sought $18 million in damages and injunctive relief.

## I

The Funds are open-end diversified investment companies registered and regulated under the Investment Company Act of 1940.[6] Virtually all their assets are invested in securities listed and traded on national securities exchanges. By 1971 Summit held securities worth $52 million, Balanced, $14 million, Growth, $197 million, and Technology, $715 million. As is the case with mutual funds, the Funds merely held title to these securities. SIS, the Funds' creator, principal underwriter and investment advisor, controlled all trading in them. In return for this service SIS received an annual management fee based on the total of the Funds assets. In 1969, SIS's advisory fees were $3.5 million and their underwriting commission $1.2 million. SIS's net assets amounted to approximately $1.5 million. Finally, SIS was controlled in turn by KCSI which owned 54 percent of outstanding SIS common stock.

During 1969 and 1970 the individual defendants staffed the Funds, SIS and KCSI. John Hawkinson was president and Russell Matthias the secretary-treasurer of all four Funds as well as SIS. Both were directors and shareholders in the Funds and SIS, and Hawkinson was a director of KCSI. Chester Tripp was a director of each of the Funds and a director and stockholder of SIS. Courtenay Davis, John Porter and Milburn Smith were the remaining directors and shareholders of SIS.

On November 6, 1969, SIS entered into a merger agreement with Kemperco. SIS agreed to transfer its business, assets and liabilities to a subsidiary of Kemperco bearing the same name, Supervised Investors Services, Inc. Kemperco in return agreed to issue to SIS's shareholders for each share of SIS stock 0.8 shares of Kemperco common stock and 0.2 warrants to purchase Kemperco common stock. During the period the merger agreement was negotiated, Kemperco stock was trading from a low of $19.50 to a high of $27.50. Since such a merger, however, would by operation of law (15 U.S.C. § 80a–15(a)(4) ) automatically terminate the advisory and underwriting contracts between SIS and the Funds, SIS promised further to recommend to Funds shareholders approval of new advisory and underwriting contracts between the Funds and the new SIS. Clearly, gaining shareholders' approval was a crucial preliminary to merger. Meetings were called for Balanced and Technology shareholders for January 15 and for Summit and Growth shareholders for February 19, 1970, and proxy materials were mailed to them.

In a covering letter Hawkinson, citing the recommendations of the SIS man-

---

5. 17 C.F.R. 240.10b–5.

6. Open-end diversified company is defined at 15 U.S.C. § 80a–5 which provides in part:
   (a) For the purposes of this subchapter, management companies are divided into open-end and closed-end companies, defined as follows:
   (1) "Open-end company" means a management company which is offering for sale or has outstanding any redeemable security of which it is the issuer.

   \*   \*   \*   \*   \*   \*

   (b) Management companies are further divided into diversified companies and non-diversified companies, defined as follows:

(1) "Diversified company" means a management company which meets the following requirements: At least 75 per centum of the value of its total assets is represented by cash and cash items (including receivables), Government securities, securities of other investment companies, and other securities for the purposes of this calculation limited in respect of any one issuer to an amount not greater in value than 5 per centum of the value of the total assets of such management company and to not more than 10 per centum of the outstanding voting securities of such issuer.

agement and the Boards of Directors of the four Funds, urged acceptance of the proposed service contracts. Hawkinson's signed letter reads in part:

With this letter you will find a notice and proxy statement with regard to the annual meeting of shareholders. . . . Before you read the proxy statement, I would like to inform you of a major new development affecting the manager of your fund. Supervised Investors Services, Inc., the Fund's investment adviser and underwriter, and Kemperco, Inc., a Chicago based insurance and financial services holding company, have jointly announced a proposed merger of Supervised Investors Services, Inc. into Kemperco, Inc. and the operation of Supervised Investors Services, Inc. as a wholly owned subsidiary of Kemperco, Inc.

The proposed merger, which is described in detail in the attached proxy statement, is subject to certain conditions, including approval by the shareholders of the Fund of new investment advisory and underwriting agreements with Supervised Investors Services, Inc.

Before going further, I want to emphasize that:

1. The proposed merger does not contemplate any changes in your Fund. Your Fund will *not* be merged. It will retain its separate identity.

2. The name, investment policies and objectives of your Fund will not be changed.

3. Supervised Investors Services, Inc., as a subsidiary of Kemperco, Inc., will continue to operate as an autonomous corporation; and there will be no changes in its management or personnel.

4. Supervised Investors Services, Inc. will continue to be responsible for investment advice and management of your Fund and the distribution of its shares.

\* \* \* \* \* \*

The management of Supervised Investors Services, Inc. believes that the proposed merger with Kemperco, Inc. will be beneficial to it and to the shareholders of the Fund in providing a more complete package of financial services and continuous highly qualified management for the future.

The Board of Directors of the Fund approves the continuation of Supervised Investors Services, Inc. as the Fund's investment adviser, manager and underwriter, and recommends approval of the new contracts described and set forth in the attached proxy statement.

Hawkinson did not mention that SIS and the Funds were bound by the proposed merger contract to recommend approval of the new service contracts nor did he indicate the financial advantage he and the other defendants would gain from the merger. The Funds shareholders voted their approval by an overwhelming majority.

In May 1970, the merger went through. SIS and Kemperco's shareholders approved the merger agreement. On May 22, 1970, the transfers of stock took place and the merger was formally completed.

Within two years, six different groups of plaintiffs commenced actions in the Northern District of Illinois challenging the SIS–Kemperco merger. The Kings' case was one of these and was brought with both shareholder derivative and shareholder class action claims. Four suits were brought as straightforward shareholder derivative actions on behalf of the Funds. *Rifken v. KCSI*, 71 C 2116 (N.D.Ill., Jan. 14, 1974); *Simonson v. Hawkinson*, 72 C 12 (N.D.Ill., Jan. 14, 1974); *Herman v. SIS*, 72 C 14 (N.D.Ill., Jan. 14, 1974); *Schwartz v. Hawkinson*, 72 C 13 (N.D.Ill., Jan. 14, 1974). Finally, the Funds themselves brought a direct action in the same federal district. *Technology v. KCSI*, 71 C 2349.

All the plaintiffs alleged substantially the same claims. First, they asserted defendants sent Funds shareholders false

and misleading proxy statements to secure approval of the SIS–Kemperco merger. They further contended that the new investment advisory and underwriting contracts were thus void. Second, they asserted the SIS–Kemperco merger breached a fiduciary duty owed to the Funds and the Funds shareholders. Arguing that the merger was in reality a sale of fiduciary office, they contended the value of Kemperco stock and warrants transferred in excess of the book value of SIS stock was an unlawful succession fee. Plaintiffs based the first set of claims on the Holding Company Act of 1940, the Securities Exchange Act of 1934 and the rules and regulations of the Securities Exchange Commission. The second set of claims proceeded on a theory of liability recognized by the Second Circuit in *Rosenfeld v. Black*, 445 F.2d 1337 (2d Cir. 1971). In *Rosenfeld* an investment advisor to a mutual fund was held personally liable for profiting from the appointment of a new advisor on his recommendation.

Unlike the other shareholder plaintiffs, the Kings moved pursuant to Rule 23, Fed.R.Civ.P., for designation of their action as a class action. They claimed to be a true class representing those persons who held stock in the Funds when the new contracts were voted on and approved. Jordan King and Dorothy King jointly held at that time 200 shares of Summit common stock and Melvin Stoller held 200 shares of Technology common stock. The defendants with the Funds opposed the motion, and Funds moved for dismissal of all pending derivative suits. Finding substantial procedural problems with proper definition of the class and notice, the district court denied the Kings class status. *King v. Kansas City Southern Industries*, 56

F.R.D. 96 (N.D.Ill.1972).[7] The court, however, refusing to dismiss the derivative actions stayed them and allowed the Funds' direct action alone to proceed.

The Kings were not put off for long. On September 11, 1972, they moved to intervene in the Funds' direct action. The Funds, the Kings contended, would not litigate aggressively since they were controlled by the principal defendants. That same day, the district court granted the Kings in their derivative capacity leave to intervene.

One year later all claims against the defendants were settled. After moving a second time for class action status the Kings with the funds and all the defendants, entered into a settlement agreement. The settlement provided that the Funds would receive $1.4 million in satisfaction of all claims asserted directly and derivatively. The Kings expressly reserved waiver of their right to pursue their class action claims on appeal. The district court held a hearing on the proposed settlement and found it "proper, fair, reasonable, just, equitable and adequate."[8] The court in its final judgment again denied the Kings' motion for class status. The Kings raised two issues: (1) did the district court abuse its discretion by denying the Kings class status pursuant to Rule 23(a), (b)(1), Fed. R.Civ.P., and (2) did the district court abuse its discretion by approving the proposed settlement agreement?

## II

The Kings contended the Funds shareholders satisfied the requirements for a Rule 23(b)(1) class and should be granted class status. They claimed that their proposed class fully meets the four prerequisites of Rule 23(a).[9] The class of

---

7. The Kings appealed the trial court's order denying them class status but their appeal was dismissed because such an order was interlocutory and not appealable under 28 U.S.C. § 1291. *King v. Kansas City Southern Industries, Inc.*, 479 F.2d 1259 (7th Cir. 1973).

8. *Technology Fund, Inc. v. Kansas City Southern Industries, Inc.*, No. 71 C 2349 (N.D.Ill., Jan. 14, 1974).

9. Rule 23(a), Fed.R.Civ.P., provides in full:

    (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the

Funds shareholders is numerous, in excess of 175,000; and each class member was misled by the same fraudulent proxy statement. The Kings alleged claims identical to the claims of all other members of the class, and they vigorously pursued them. The Kings also believed the specific requirements of Rule 23(b)(1) were met.[10] Denying direct recovery to the Funds shareholders creates, they believed, the risk of inconsistent adjudications.

The defendants and the Funds contended that a class action was inappropriate and useless. They argued that the prejudice arising from varying adjudications was no greater than in any other type of class action inasmuch as a multiplicity of suits, considering the small monetary interest of the class members, was unlikely. They also asserted that the Kings as class representatives would not protect the interests of the class. Finally, they urged that the derivative actions and the Funds' direct action would accomplish all that the Kings' class action would accomplish.

The district court denied the class action. Faced with three alternative ways to proceed—a class action, a direct action, or a direct action with intervening plaintiffs—the court chose a direct action by the Funds and invited the Kings and the Simonson shareholders to intervene. The court correctly believed that this procedure would further the policies underlying the *Rosenfeld* claims and avoid the problems relating to notice and to the definition and determination of the appropriate class.

Determination of the manageability of class actions is, once Rule 23 is properly applied, a matter for the trial court's discretion. Rule 23(c)(1) Fed.R. Civ.P.;[11] *City of New York v. International Pipe and Ceramics Corp.*, 410 F.2d 295 (2d Cir. 1969). This is true for all class actions. 3B J. Moore, Federal Practice ¶ 23.50, at 1101 (2d ed. 1974); C. Wright, Law of Federal Courts 314 (2d ed. 1970). The trial court's determination may be set aside only for abuse. *Grand Rapids Furniture Co. v. Grand Rapids F. Co.*, 127 F.2d 245 (7th Cir. 1942); *Weeks v. Bareco Oil Co.*, 125 F.2d 84 (7th Cir. 1941). In *Weeks* this court said concerning district court determinations pursuant to Rule 23:

> We are advised, and accede to the contention, that the District Court has a discretion, and the existence of that discretion narrows the scope of our investigation. . . . In most instances, we may say, generally, that the question of discretion is the display of sound judgment. In the proper case it may not be disturbed by an appellate court except for abuse.

*Id.* at 93.

The trial court's discretion, however is limited. *Fujishima v. Board of Education*, 460 F.2d 1355 (7th Cir. 1972). Rule 23 must be liberally interpreted. 3B J. Moore, Federal Practice ¶ 23.02[4], at 81 (2d ed. 1974), and cases cited in footnotes

---

claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

10. Rule 23(b)(1), Fed.R.Civ.P., provides in full:
   (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
   (1) the prosecution of separate actions by or against individual members of the class would create a risk of
   (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests . . . . .

11. Rule 23(c)(1), Fed.R.Civ.P., provides in full:
   As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.

1 and 2. Its policy is to favor maintenance of class actions. *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555 (2d Cir. 1968); *Esplin v. Hirschi,* 402 F.2d 94 (10th Cir. 1968). This policy operates just as surely in cases where securities fraud is charged. *Green v. Wolf Corporation,* 406 F.2d 291 (2d Cir. 1968); Note, *Class Action Treatment of Securities Fraud Suits Under the Revised Rule 23.* 36 Geo. Wash.L.Rev. 1150 (1968). *See also* Advisory Committee's Note to Rule 23, 1966 Amendments, 39 F.R.D. 95, 101, 103 (1966). It is especially strong in instances where denial of class status would effectively terminate further litigation of the securities fraud claims. *Ziegler v. Gibralter Life Insurance Company of America,* 43 F.R.D. 169 (D.S.D.1967); *cf. Hawaii v. Standard Oil Co.,* 405 U.S. 251, 266, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). However, this is not the case here.

█ The district court's denial of class status was a proper exercise of its discretion. The court's reasoning was twofold: (1) a class action would not best further the underlying policies of *Rosenfeld,* and (2) the procedural difficulties of a class action were serious.

The principal aim of a *Rosenfeld* suit is prophylactic. The district court correctly stated:

> The basic purpose behind the *Rosenfeld* holding is to prevent the shareholders and directors of an investment adviser from utilizing their position to extract profits from a buyer which may be conditional on favorable treatment to the successor and to the future detriment of the Funds. . . .
> The very existence of the prophylactic rule and its effect of taking away any gain in the sale of the adviser acts as a deterrent against future wrongdoing.

*King, supra* at 99.

The court found that the purposes underlying a *Rosenfeld* claim could be equally well achieved by allowing either the Kings' class action, the Funds' direct action or any one of the five derivative suits to proceed. Enforcement brings deterrence. It is unimportant who brings the suit so long as the *Rosenfeld* claim is vigorously prosecuted.

The court's reasoning is strengthened by a forecast of the possible recoveries under the six different suits. As mutual funds, the Funds principal function is to hold title to the securities which are traded by their investment advisor. These securities comprise for the most part their net assets. The value of each share of Funds stock is directly proportional to the net assets of the Funds, and the value of each share of Funds stock increases as the net assets of the Funds increases. Both the direct action and the derivative suit would gain a corporate recovery thereby increasing the Funds net assets and consequently the value of each share of Funds stock. Thus, the Funds shareholders, including those members of the Kings' proposed class who still hold Funds stock, would immediately benefit from the recovery and could realize their share of the recovery by redeeming their stock. These stockholders would not derive any advantage from pursuing a class action. The only shareholders denied recovery under a corporate recovery are those who sold their Funds stock prior to the time of recovery. A class action might be maintained in some instances to protect these former shareholders unless it involved the serious procedural difficulties which are present in the Kings' proposed class action.

The Kings' proposed class does not provide a vehicle of recovery for all individuals possessing a possible *Rosenfeld* claim. The Kings describe their class as follows:

> Plaintiffs, in the alternative, brings this Count as a class action pursuant to Rule 23(b)(1)(A) and (B) of the Federal Rules of Civil Procedure on their own behalf and on behalf of all other stockholders and former stockholders of all four of the Funds, namely of Summit, of Balanced, of Growth and of Technology, similarly situated, namely, all of those persons (other

than defendants and those in privity with them) who held stock in any one of the four Funds on the record date, in or about December of 1969 for the annual meeting of stockholders of the Fund held in January or February of 1970 at which approval of the new advisory contracts between Manager and the Fund was obtained.

Fourth Amended Complaint, Count V, ¶ 65.

The Kings claimed to represent the group of shareholders who approved the merger. In fact, the *Rosenfeld* claims arose several months later at the consummation of the SIS–Kemperco merger. To determine the class as the Kings propose would include individuals who would benefit from the corporate recovery and exclude those who could assert a *Rosenfeld* claim but would not benefit from the Funds action. First, there are individuals who held stock on the record date and did not redeem it before judgment was entered in the Funds action. As the Kings' class is drawn these individuals would recover both on the Funds action and on the class action. Also, with the high rate of turnover among Funds shareholders, there are those individuals who held Funds stock on the record date but sold it before the merger. As members of the Kings' class, these individuals would recover even though they were not members of the group wronged. Lastly, the Kings' class would exclude those shareholders who purchased Funds stock after the record date and sold it before the Funds' recovery. Under any class action on a *Rosenfeld* claim, these individuals must recover. *See Rosenfeld v. Black,* 336 F.Supp. 84, 91 (S.D.N.Y.1972). It would be a mammoth task to sort out those Funds shareholders possessing a *Rosenfeld* claim, for over 175,000 individuals held Funds stock on the record date.

The trial court correctly chose to permit the Funds direct action. It was a practical decision within its discretion. The Funds action was easier to manage. In other instances a class action, either by itself or as a complement to a direct or derivative action, might be proper. This would be true where there are sufficient facts to support a *Rosenfeld* claim and in the judgment of the district court a class action is the most efficient or perhaps the only way to pursue it. The most serious shortcoming of the Funds direct action was the defendants' dominance of the Funds. The trial court, however, by allowing the Kings and Simonson to intervene, insured an adversary proceeding.

### III

The Kings contend the district court abused its discretion when it approved the proposed $1.4 million settlement sum. SIS shareholders allegedly received for their stock, having a book value of $1.5 million, $19 million of Kemperco securities. Thus, the succession fee appears to be in excess of $17 million, an immense figure when compared with the meager settlement offer. The defendants contend that the Kings are estopped from challenging the settlement. The Kings, they argue, agreed to the reasonableness of the settlement terms reserving only the right to attack the corporate recovery and assert a class recovery.

■ The Kings are estopped from challenging the settlement. It is apparent from the record that the Kings consented to the terms of the settlement. The Kings with Simonson were a party to the settlement negotiations and aggressively pushed for the $1.4 million recovery. In a hearing before the district court, the Kings agreed that the proposed settlement of their derivative claims was reasonable. Furthermore, in a letter to the district judge dated September 6, 1973 they said:

[W]e had no present objection to the amount of the proposed $1,400,000 settlement. However, [we] fully intend to pursue [our] position that any recovery in the case should be for the class of persons injured and not a corporate recovery for the funds.

Finally, the stipulation of settlement submitted to the district court bears the

**28**

Kings' signature. They only reserved waiver of their "rights to pursue the King class action." Tr. Vol. III, No. 131 at 13. All other claims they gave up. Since the district court properly denied the Kings class action status, the Kings are estopped from challenging their settlement stipulation.

Accordingly, we affirm the judgment of the district court approving the stipulated settlement and denying the Kings class status.

Affirmed.