437 So.2d 1014 (1983)
MARSHALL DURBIN & CO. OF JASPER, INC.
v.
JASPER UTILITIES BOARD OF the CITY OF JASPER, Alabama.
JASPER UTILITIES BOARD OF the CITY OF JASPER, Alabama
v.
MARSHALL DURBIN & CO. OF JASPER, INC.
80-859, 80-885, 81-139, 81-526 and 81-480.
Supreme Court of Alabama.
July 15, 1983.
Rehearing Denied September 16, 1983.
*1016 C. Lee Reeves and Susan B. Mitchell of Sirote, Permutt, Friend, Friedman, Held & Apolinsky, Birmingham, for appellant cross appellee.
Edward R. Jackson of Tweedy, Jackson & Beech, Jasper, and Carl E. Johnson, Jr., of Bishop, Colvin & Johnson, Birmingham, for appellee cross appellant.
TORBERT, Chief Justice.
These consolidated appeals address the legal propriety of sewer, water, and gas rates imposed upon Marshall Durbin & Co. (Durbin) by the Jasper Utilities Board (Board) for services provided since 1973. Durbin appeals from the trial court's order which 1) found all the rates and charges reasonable; 2) vacated all previously issued injunctions; and 3) granted summary judgment on the Board's counterclaim for $516,638.59 in unpaid charges.
Durbin contests, inter alia, 1) the methodology and consumer classifications utilized by the Board in establishing its rates and charges, and 2) the scope of review utilized by the trial court when testing the legality of the Board's rate-making decisions. More specifically, Durbin contends certain rates and surcharges were unreasonable, discriminatory, arbitrary, and unlawful and that it therefore suffered confiscation of its property without due process of law.
Durbin operates a chicken processing plant in the City of Jasper, and is one of the Board's largest users of water, sewer, and gas services. In 1961, the City constructed, with proceeds from a million-dollar bond issue, a sewer treatment plant to accommodate the needs of Durbin. In 1971, the city conveyed the sewer system and facilities to the Board, which began operating the system in conjunction with the Board's existing water and sewer service facilities.
In late 1972, correspondence between Durbin and the Alabama Water Improvement Commission (AWIC) disclosed that Durbin's sewage discharge was causing problems with the sewage treatment plant operations. AWIC recommended that Durbin install pretreatment facilities to alleviate the sewage overloading problems created *1017 by Durbin's inadequate removal of blood, feathers, offal, and grease waste, which resulted from the processing of 13,000 to 14,000 chickens per hour.
In October 1973, the Board passed a resolution establishing a sewer surcharge rate for sewage waste water above certain strength levels. While admitting that one purpose of this surcharge was to encourage Durbin to pretreat its wastes, the Board also contends this surcharge was necessary to defray additional costs necessitated by Durbin's extra-strength wastes.
The Board periodically analyzed the waste water from Durbin's plant and, based on the waste concentration levels, billed Durbin accordingly. Durbin paid all sewer surcharges billed prior to April 1, 1977. A dispute then arose between Durbin and the Board over the testing analysis and cost allocation methodology used by the Board in billing. Durbin, contending the surcharges were unreasonable, computed a surcharge using different cost allocation techniques, and thereafter paid the accrued billings only to the extent of this computation.
Durbin filed suit on June 24, 1977, seeking a declaratory judgment establishing the illegality of the surcharges and, additionally, seeking an injunction to prevent the Board 1) from shutting off or interfering with the supply of water and/or sewage service, and 2) from collecting or attempting to enforce the surcharge. A temporary restraining order was issued by the trial court. On December 28, 1978, the Board filed its answer and a counterclaim for $142,127.08 for past due bills.
In June 1979, the Board, based upon numerous studies by sanitary sewer engineers, increased the basic sewer rate (unchanged since October 1973) from $.25 to $.55 per thousand gallons of effluent discharged. In August 1979, Durbin sought, and was granted, an injunction prohibiting the board from collecting the new basic sewer rates or interrupting water or sewer service. The Board, again considering hydraulic cost studies, increased the basic effluent discharge rate to $.65 effective December 1980.
The Board established two classes of water customers: 1) residential; and 2) wholesale and industrial. During all of the periods here involved, Durbin has been in the lowest water bracketan industrial user. Cost studies indicated that the cost of producing and distributing wholesale water exceeded the sales price to Durbin during this entire period. Administrative costs are allocated among its water customers on a gallonage basis, rather than by charging a flat rate per customer, as the Board does for its sewer customers.
The Board classifies gas customers based upon distinctions in their needs and services. As to each of the customer classifications, the evidence clearly shows: 1) the Board made substantially more money on its gas operations than it cost to provide that service; 2) during every year from 1974 through 1980, the Board's total system rate of return was lower than the rate of return on the gas system alone; and 3) the Board used some of the profit generated from the gas operations to subsidize the losses incurred on the sewer and water systems.
By subsequent amendments to its original complaint, Durbin challenged the legality of the water and gas rates and requested the court to:
"[O]rder and enjoin the defendant (1) to institute and implement a cost of service study and rate study on each separate utility service, (2) to set all future rates and establish appropriate and reasonable customer classes in any future rates by utilizing accepted and appropriate cost of service studies and rate studies for each utility service, and (3) to implement only fair, equitable, and reasonable rates that reflect the true cost of service to the plaintiff."
Durbin sought, and was denied, class certification for the gas customers. The case was tried during May and June 1981. The lower court entered an order in favor of the Board on all of Durbin's claims in August 1981. In October 1981, the trial court granted a motion for summary judgment on *1018 the counterclaim against Durbin for $516,638.59 in past due bills.

THE STANDARD OF REVIEW
The appropriate standard of review applicable in municipal rate cases is of crucial importance, and involves a two-tiered inquiry: 1) Did the trial court utilize the proper standard in reviewing the Board's actions; and 2) Did the trial court, in applying the standard of review to the evidence, exceed the bounds of lawful discretion, or base its judgment upon incorrect law or clearly erroneous findings of fact?
Durbin contends the trial court should have considered the case as an original civil proceeding, determined what methodology should have been used in setting rates, and determined what expert testimony to accept or reject. Durbin also contends, in essence, that a broader standard of review is applicable to municipal utilities, governed by municipal utility boards, than is applicable to privately owned utilities, regulated by the Alabama Public Service Commission (APSC).
The Board contends that ratemaking is a legislative function and that in reviewing the rates established by a municipal board the trial court does not act in a nisi prius function; rather, that in reviewing legislative ratemaking orders, the trial court accords a presumption of reasonableness and validity to the actions of the board.
The lower court, in determining the standard of review, stated the following:
"Though there are no cases which directly put a municipality established board in the same position as the Alabama Public Service Commission (A.P. S.C.) with regard to Court review, this court is of the opinion that a municipality board is a legislative body which functions in the same or similar manner as the A.P.S.C. A private utility must have the approval of the A.P.S.C. before new rates can be imposed. The A.P.S.C. acts as a legislative body, the members of which are elected to that office to regulate, in many cases, monopolistic utilities.
"A public utility board established by statute and appointed by the elected city officials of the municipality, in the opinion of this court, sits in the same position with regard to the intent of the legislature, as the A.P.S.C. and as it relates to court review.
"The Court is further of the opinion that the Board did not act arbitrarily, unlawfully or unreasonably in its methodology in establishing and assigning the various functions of the sewer plant as these functions relate to billing. The plaintiff set forth one methodology of cost distribution (how components of the plant are designated for billing, i.e., administration versus operational cost). The defendant, through expert testimony, set forth another methodology of cost distribution. Both are most persuasive. This court declines and is without legal authority to choose between the two when such testimony is presented, if both theories are credible and not unreasonable to the point of being unlawful."
Thus, the actions of the Board, when it acts in its legislative capacity to promulgate rates, as when it takes other legislative actions, are attended with a presumption of validity. We are in accord with this analysis of the trial court.
The Jasper Utilities Board was incorporated as a public corporation pursuant to Code 1975, § 11-50-310, et seq. The governing body of the municipality elects the directors of the Board. Code 1975, § 11-50-313. Thus, at least indirectly, the utility is answerable to the general public through the election process.
The Board is in a unique position in relation to public utility services. First, the Board is the proprietor of a critical public enterprise. Second, the Board is charged with the responsibility of setting utility rates at a level that is reasonable in light of the powers outlined in Code 1975, § 11-50-314. Mitchell v. City of Mobile, 244 Ala. 442, 13 So.2d 664 (1943). We are of the opinion that this arrangement has a built-in system of checks and balances which will assist in keeping the rates reasonable while *1019 providing sufficient income to finance the services. The municipality is not primarily involved in the utility business as a profit-oriented enterprise. Rather, the municipality carries on this municipal function in a service oriented context. Further, the Board, through the elected city officials, is "subject to their [the people's] control through the democratic processes." Mitchell, supra at 445, 13 So.2d 664.
The Jasper Utilities Board acts as an agent of the municipality. Jackson v. Hubbard, 256 Ala. 114, 53 So.2d 723 (1951). As such, the Board is charged with the responsibility to set rates for utility services, and that power is a legislative function. Richardson v. Morrow, 276 Ala. 385, 162 So.2d 480 (1964). There is no statutory presumption of correctness accorded the actions of the board comparable to the provision governing the actions of the APSC (Code 1975, § 37-1-99). We are nonetheless persuaded that in carrying out this legislative function, the actions of the Board should be presumed to be valid. While we have not heretofore spoken to this question, we are convinced from examining case law from other jurisdictions that this is the proper result.
In Gillam v. City of Ft. Worth, 287 S.W.2d 494 (Tex.Civ.App.1956), that court stated, "The presumption is in favor of the legality of the rate established by the rate making authority." 287 S.W.2d at 497. See, 64 Am.Jur.2d Public Utilities § 127 (1972) ("In general, a rate fixed by an authorized ratemaking body for a public utility is presumed to be valid and reasonable"); see also, National Foundation v. City of Ft. Worth, 415 F.2d 41 (5th Cir.1969); Goldblatt v. Town of Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). See generally, C. Dallas Sands, Sutherland Statutory Construction § 30.05 (1972).
The trial court, in reviewing the rates set by the Board, must determine whether these rates are reasonable. In Water Works Board of Town of Parrish v. White, 281 Ala. 357, 202 So.2d 721 (1967), this Court stated that "water rates imposed by a municipality must be reasonable and [are] subject to review in that regard upon complaint of a customer." 281 Ala. at 361, 202 So.2d at 724. The rate set for these services may not be "arbitrary or discriminatory." Benson v. City of Andalusia, 240 Ala. 99, 195 So. 443 (1940). See also, Mitchell v. City of Mobile, supra. The trial court, in reviewing the actions of the Board, sought to determine whether the Board acted "arbitrarily, unlawfully or unreasonably." Thus, we are of the opinion that the trial court utilized the proper standard in reviewing the Board's actions.
The second question for our consideration, is whether in applying the standard set forth above, the trial court based its judgment upon incorrect law or clearly erroneous factual determinations.
At the outset, we must determine whether the Board's practice of consolidating the water, sewer, and gas systems for the purpose of rate making is appropriate. Durbin argues that rate making must be done on a "stand alone" basis and that no service in the system should subsidize another service in the system. The rate structure of the Board results in revenue for the water and sewer services that are less than the cost of providing those services. Conversely, the gas rates are higher than the cost of service. Thus, the gas rates subsidize the operation of the water and sewer services.
The trial court held:
"[T]he Court finds that combining the three services of the Jasper Utilities Board is not statutorily prohibited, but in fact is allowed by statute. The requirements of the bond indentures and requirements in the bond agreements also require the consolidation of these services. There are also no legal requirements which prohibit one service from supporting the other services, so long as the profits from that service are not so great as to be unlawful and the Court so finds."
We agree with the trial court that it is not improper to combine these three services for the purpose of ratemaking. This *1020 Court has held that a municipality may generate a profit on one system and use that profit to subsidize the operation of another service. In Campbell v. Water Works & Sanitary Sewer Board of Montgomery, 270 Ala. 33, 115 So.2d 519 (1959), this Court, when confronted with a similar argument, stated:
"[W]e consider that since the board has the right to charge rates which will create a `surplus', then it necessarily follows that the surplus which will not be needed for the maintenance of the water system can be used for other corporate purposes, such as the maintenance of its sewer system."
270 Ala. at 37, 115 So.2d at 523. We are of the opinion that Code 1975, § 11-50-321, allowing for the consolidation of these systems for operational, accounting, and financing purposes, provides further support for this result.
Thus, we hold the trial court was not in error in allowing ratemaking on a consolidated basis. However, we are also of the opinion that the reasonableness standard by which the overall rate structure is judged also applies to the amount of surplus or profit that may be generated from any one service. In the case before us, the evidence indicates that the income generated by the gas service resulted in an unreasonable rate of return despite the fact that the overall rate of return was reasonable. The specifics as to the gas rates will be discussed below. However, as to the standard of review used by the trial court, we find that it was improperly applied in reviewing the gas rates.

GAS SERVICES
Durbin contends that the gas rates are excessive and arbitrary as to all customers. At trial Durbin presented an expert's testimony on what would have been a fair rate of return for gas services:

Year Fair Rate of Return
1974 8.10%
1975 8.56%
1976 7.92%
1977 7.79%
1978 8.25%
1979 8.57%
1980 10.38%

A second expert witness for Durbin presented the following calculations of actual rate of return:

Year Actual Rate of Return
1974 10.51%
1975 13.95%
1976 73.20%
1977 40.02%
1978 60.86%
1979 28.05%
1980 42.12%

The Board presented the following evidence on the actual rate of return for the system as a whole:

Year Rate of Return
1974 5.30%
1975 3.54%
1976 6.51%
1977 4.39%
1978 4.49%
1979 2.18%
1980 4.02%

No evidence was offered by the Board on rate of return on gas services alone.
As we have stated, a consolidated utility system may establish rates which, in effect, allow one component of the system to subsidize another component, where the overall rate structure is reasonable. Nonetheless, the profit on any one system may not unduly burden the customers with rates which are unreasonable in order to offer lower rates for other services.
In the case before us, we find that the Board failed to present any evidence as to the reasonableness of the rate of return on gas services. Therefore, we hold that it was error for the trial court to find that "the profits from that service [gas] are not so great as to be unlawful." This portion of the trial court's order is due to be reversed.

SEWER SURCHARGE
On October 30, 1973, the Board adopted a resolution revising the rates for sewer services. That resolution provided that a surcharge *1021 of $.035 per pound would be imposed on wastes having concentrations of suspended solids (SS) and biological oxygen demand (BOD) greater than 300 parts per million (ppm). The effective date for the sewer surcharges on SS and BOD was May 1, 1974. No surcharge was placed on the discharge of oil and grease (O & G) until September 24, 1974, when the original resolution was amended to include a $.035 per pound surcharge on O & G above 100 ppm.
The Board began collecting surcharges for BOD and SS at the rate of $.035 per pound in May of 1974, as provided in the October 1973 resolution. In addition, the Board began to impose a $.035 per pound surcharge on O & G in May 1974, although the resolution providing for that surcharge was not enacted until September 1974. Durbin contends the surcharges on O & G of $4,020.75 that were paid from May 1974 through September 1974 were unauthorized and illegal.
On January 20, 1976, the Board enacted a "Resolution Adopting Rules and Regulations for the use of the Sanitary Sewer System." That resolution provided that for BOD and SS concentrations greater that 250 milligrams per liter (mg/1), the party discharging the wastes "shall pay the reasonable additional cost" incurred by the Board in treating the waste. Likewise, a surcharge for the "reasonable additional cost" incurred in treating O & G above 100 mg/1 was imposed. The effective date of the resolution was February 1, 1976.
The Board continued to bill Durbin at the rate of $.035 per pound for all wastes after the January 20, 1976, resolution was passed which provided for a surcharge based upon the "reasonable additional costs" incurred for treatment, rather than a set fee.
Durbin contends that no attempt has ever been made to determine the Board's cost for treating O & G. Nonetheless the Board has charged Durbin approximately $134,000.00 in O & G surcharges. The Board had commissioned a study in January 1973 of the average cost of treatment for BOD and SS. The study apparently was the basis for the rates set in October 1973 of $.035 per pound. In a letter dated October 29, 1973, Felix Harris, who performed the study, stated that the cost involved in treating BOD above normal strength was $.031 per pound and recommended a surcharge of $.035 per pound. The letter also stated:
"We are unable at this time, to calculate the exact cost of treating waste with suspended solids greater than 300 p.p.m. but in other municipalities have found that the cost is similar to that for treating excess B.O.D. We therefore recommend that the charge for excess suspended solids also be set at 3½ cents per pound."
The Board contends that the January 20, 1976, resolution of the Board did not repeal the rates set in the October 1973 resolution. There is no provision in the 1976 resolution that specifically repeals the earlier act. The Board also states:
"Durbin's contention [that] there has been no effort made by the Board to determine the reasonable additional cost attributable to its processing of above normal strength waste, is not completely accurate." (Emphasis added.)
The Board refers to a 1979 study which made no "specific reference" to surcharge costs and to the yearly audits of the Board from 1976 through 1980. The Board also relies upon a letter from Lucas and Carr Engineers, Inc., which states that "the surcharges recommended were determined from an analysis of ordinances of similar size cities."
After reviewing the evidence presented, we are of the opinion that the Board acted unreasonably in relation to the sewer surcharges in a number of ways. First, there was no ordinance allowing the collection of a surcharge on O & G from May 1974 through September 1974. We are of the opinion that the Board could not impose a surcharge on Durbin without enacting some enabling legislation setting the surcharge. See, Johnson v. Mayor and City Commissioner of City of Natchitoches, 14 La.App. 40, 129 So. 433 (1930).
*1022 Second, we find that the Board acted unreasonably in the manner in which it set its rates for O & G and SS following the passage of the resolution in 1976. From October 1974 through January 20, 1976, the Board had in effect a surcharge which we find to be reasonable and enforceable. However, we find that the resolution passed by the Board in January 1976 changed the basis upon which the Board could make surcharges. That resolution called for surcharges based upon the "reasonable additional costs" incurred in providing treatment services. While the 1973 study provided some information on costs for BOD, which could have been the basis for the $.035 surcharge for BOD, there was no information on either O & G or SS and thus we find that it was improper for the Board to impose a surcharge on O & G and SS from 1976 until the present. We find that the Board's contention that the 1973 rates remained in effect, despite the 1976 resolution, untenable. The 1976 resolution appears to be a comprehensive plan for sewer service charges. Even without a specific repealer provision, it clearly changed the basis upon which the rates were to be calculated. This is not to say that the rate structures themselves were unreasonable; rather, the manner in which the rate structure was administered was unreasonable.
Durbin also contends that the Board failed to follow its own regulation as to the sampling of sewer discharge for a determination of the surcharges to be imposed. The 1976 resolution provided that "a determination of character and strength of said wastes shall be made quarterly, or more often as may be deemed necessary." Durbin states that its wastes were measured every six months and, at times, at longer intervals. The record of the samplings introduced at trial, for example, indicate that one sampling was done in February 1976, and that the next sample was not taken until February 1977. The Board's only response to this contention is that "[t]he taking of some samples was delayed during periods of rain," and that "Durbin never requested a sample that was not promptly taken."
Again, we are of the opinion that the Board set forth a reasonable rate structure and administrative procedure in the 1976 resolution, but that the Board failed to follow the sampling procedures set forth therein. We hold that in administering the lawfully enacted rate structure a municipal board must follow its own rules and regulations. Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). Thus, for those quarters when no sampling took place, we are of the opinion that it was unreasonable and arbitrary for the Board to continue to impose the surcharge, absent some compelling reason for failure to sample the sewer discharge.
Durbin also contends that the manner in which samples were analyzed for O & G and SS were unreasonable. Durbin states:
"The unrefuted testimony of Dr. Thompson shows that the Board's analyses of Durbin's wastes are double counting O & G and therefore billing Durbin twice for O & G. Because the method used in analyzing SS picks up the insoluble O & G in the wastes as a part of the SS, that billing based on the SS analysis is, in part, billed based on O & G as well. Then the board bills separately for O & G based on analysis of all O & G, both soluble and insoluble. Fifty percent of the O & G has already been filtered out and measured as a part of the suspended solids. Therefore, the board is in effect billing Durbin twice [for] some of the O & G in its wastes."
The Board makes no response to this contention.
The trial court made no specific finding as to the reasonableness of this procedure, but by granting the motion for summary judgment on the counterclaim by the Board, the trial court implicitly held that this procedure was not unreasonable. We disagree. The testimony for Durbin concerning the double measurement of O & G was undisputed and, therefore, it was improper for the trial court to grant the *1023 board's motion for summary judgment for the full past due amounts.
Durbin also argues that the surcharge rates were applied in a discriminatory fashion in that Durbin was the only customer being billed for a surcharge up until 1977. Beginning in 1977, Southern Animal Foods, a company using the same sewer line as Durbin, was charged the surcharges.
The testimony at trial indicated that there were a number of other users in the system such as hospitals, restaurants, and car washes that discharged BOD, SS, or O & G at concentration levels that would have justified a surcharge.
While we agree with the proposition that discriminatory application of utility rates is unconstitutional, Water Works Board of Town of Parrish v. White, 281 Ala. 357, 202 So.2d 721 (1967), we disagree with Durbin's analysis on the facts of this case. There was evidence presented that the Board's practice could have been based upon Environmental Protection Agency regulations which required cost recovery for above normal strength wastes from users whose water flow exceeded a certain level. Durbin is apparently the only user whose flow requires cost recovery (via the surcharges), and therefore we find that the application of the surcharge only against Durbin is not unreasonable.
Finally, Durbin contends that the surcharges are unconstitutional in that they deny due process because no notice and hearing were provided to Durbin. We need not address this issue, because we find that Durbin had notice of all Board meetings in that these were public meetings scheduled on a regular basis. There is no statutory requirement that the Board give individual notice and provide a hearing before enacting new rates, and this Court will not impose such a requirement. See, Sellers v. Iowa Power and Light Co., 372 F.Supp. 1169 (S.D.Iowa 1974).
In summary, we hold that the rate structure itself was not unreasonable; however, the following actions of the Board under that structure were unreasonable:
1. The imposition of a surcharge for O & G prior to September 1974;
2. The imposition of a surcharge for SS and O & G from January 1976 until the present without establishing the cost of this service;
3. The failure to take quarterly samples as provided in the January 1976 resolution.
We are also of the opinion that it was error for the trial court to grant summary judgment on the counterclaim in light of the undisputed evidence concerning the double measurement of SS and O & G.

WATER RATES
Durbin contends that water rates charged by the Board which became effective on June 18, 1979, and a subsequent increase effective December 18, 1980, were prejudicial to Durbin and were much higher than the cost of providing the service to Durbin. Durbin states in its brief:
"The purpose of Durbin's attack on the water rates was to have the trial court order the Board to conduct a proper cost of service study, utilizing accepted and proper principles in the industry, to determine fair and equitable rates to Durbin."
Durbin contends that the Board failed to develop proper customer classifications, misallocated various expenses and failed to take into account non-operating income.
The Board presented testimony concerning five cost of service studies performed during the period 1978 through 1980. These studies indicate that the cost of producing and distributing water to Durbin substantially exceeded the sale price to Durbin during this period. Durbin disagrees with the methodology used in arriving at these figures.
In Birmingham Electric Co. v. Alabama Public Service Commission, 254 Ala. 140, 146, 47 So.2d 455, 459 (1950), this Court stated:
"Much has been written on the question of what constitutes just and reasonable rates. We shall make no attempt to analyze all the authorities dealing with *1024 the subject. The question cannot be determined with mathematical precision or the use of any set formula or formulae. It must be determined in the exercise of a fair, enlightened and independent judgment in the light of all the relevant facts. It must be just and reasonable to both the investors' interest and the consumers' interest.
". . . .
"In St. Joseph Stockyards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 725, 80 L.Ed. 1033, it was said: `The fixing of rates is a legislative act. In determining the scope of judicial review of that act, there is a distinction between action within the sphere of legislative authority and action which transcends the limits of legislative power. Exercising its rate-making authority, the Legislature has a broad discretion. It may exercise that authority directly, or through the agency it creates or appoints to act for that purpose in accordance with appropriate standards. The court does not sit as a board of revision to substitute its judgment for that of the Legislature or its agents as to matters within the province of either.... In such cases the judicial inquiry into the facts goes no further than to ascertain whether there is evidence to support the findings, and the question of the weight of the evidence in determining issues of fact lies with the legislative agency acting within its statutory authority.'"
We are of the opinion that there was substantial evidence presented that the rates charged to Durbin were closely related to the cost of providing service to this customer. The trial court was not in error in holding that the water rates were reasonable and this portion of the order is due to be affirmed.

BASIC SEWER RATES
In addition to the sewer surcharges, Durbin pays a basic sewer service charge. All customers using the Board's sewer services pay the same rate based upon the volume of effluent discharged. Durbin contends that the rates which became effective June 18, 1979, and the increase effective December 18, 1980, were unreasonable. Specifically, appellant argues that failure to classify users penalizes Durbin because it costs less to provide sewer services to larger users. Durbin contends that the rates should vary for residential, commercial, and industrial users rather than having a single rate structure for all users.
While it is well settled that utilities may classify various users for the purpose of setting rates, Code 1975, § 7-1-51; M.W. Smith Lumber Co. v. Alabama Public Service Commission, 247 Ala. 318, 24 So.2d 409 (1946), we are of the opinion that there is no mandate that they do so. Thus, we hold that the rate structure for sewer services is not inequitable because it fails to classify users.
Durbin also points to several alleged inadequacies in the methodology used for setting sewer rates. The Board set the rates based upon two studies, one performed in 1979 and one in 1980. Durbin's witnesses testified concerning misallocation of costs associated with infiltration and inflow, use of the cash basis of accounting, misallocation of administrative charges, and improper use of a set inflation figure. As discussed in the "WATER RATES" section of this opinion, we cannot say that the methodology used was unreasonable. Conflicting evidence was presented on each of these factors, and we cannot say that the trial court erred in holding that the overall structure was reasonable.

CLASS CERTIFICATION
In its first amended complaint on October 13, 1977, Durbin sought class action certification, seeking to represent all customers of the Board who used and purchased natural gas. Durbin did not seek class certification to represent users of water and sewer services. A class certification hearing, lasting three days, was held in July 1980. On December 4, 1980, the trial court issued an order denying class certification.
*1025 In order to obtain class certification, the plaintiff must meet all of the criteria set forth in A.R.Civ.P. 23(a) and one of the criteria set forth in 23(b). Assuming that all of these criteria have been met, it remains within the discretion of the trial court whether to certify a class, after considering practicality and manageability of the litigation. In interpreting the Federal rule, which is virtually identical to the Alabama rule, it has been stated:
"Determination of the manageability of class actions is, once Rule 23 is properly applied, a matter for the trial court's discretion. Rule 23(c)(1) Fed.R.Civ.P.; City of New York v. International Pipe and Ceramics Corp., 410 F.2d 295 (2d Cir. 1969). This is true for all class actions. 3B J. Moore, Federal Practice ¶ 23.50, at 1101 (2d ed. 1974); C. Wright, Law of Federal Courts 314 (2d ed. 1970). The trial court's determination may be set aside only for abuse. Grand Rapids Furniture Co. v. Grand Rapids F. Co., 127 F.2d 245 (7th Cir.1942); Weeks v. Bareco Oil Co., 125 F.2d 84 (7th Cir.1941). In Weeks this court said concerning district court determinations pursuant to Rule 23:
"`We are advised, and accede to the contention, that the District court has a discretion, and the existence of that discretion narrows the scope of our investigation.... In most instances, we may say, generally, that the question of discretion is the display of sound judgment. In the proper case it may not be disturbed by an appellate court except for abuse.' "Id. at 93."
King v. Kansas City Southern Industries, Inc., 519 F.2d 20, 25 (7th Cir.1975) (footnote omitted).
In the case before us, the trial court determined that a class action would be unmanageable. The trial court made this determination because approximately 28% of the proposed class would be subject to compulsory counterclaims on delinquent gas service accounts. Each of these accounts would be subject to individual defenses which would complicate the litigation and, in the words of the trial court, "defeat the manageability requirement of a class action." The trial court was also of the opinion that "severing the delinquent members of the class or making the delinquent members of the class a subclass ... would not promote judicial efficiency." Again, we are of the opinion that this determination was not an abuse of the trial court's discretion.
We are also of the opinion that this is the correct result, because Durbin sought to represent only the class of gas customers and not the users of water and sewer services. The issue of the interrelationship of the three rate structures was of central importance to this case. Handling one segment as a class action and the other two as cases brought by an individual plaintiff would add to the unmanageability of the suit. Further, although we need not consider this issue, we are of the opinion that the plaintiff failed to meet several of the requirements under A.R.Civ.P. 23(a) and 23(b). Therefore, we hold that the trial court did not err in denying class certification in this case.

SUMMARY JUDGMENT
On October 21, 1981, the trial court granted summary judgment for the Board on its counterclaim for $516,638.59 for past due billings.
Because of our holding that the Board acted improperly in relation to the sewer surcharges, we are of the opinion that summary judgment for the full amount of the counterclaim was erroneous. Therefore, we reverse this portion of the trial court's order and remand for proceedings consistent with the holdings in this opinion.

REFUNDS
Durbin contends that it is due a refund for all charges found by the court to be excessive or unreasonable. Specifically, Durbin says, the improper sewer surcharges discussed above and the rate for gas services which yielded an unreasonable rate of return on this component of the system would necessitate a refund of these charges to Durbin.
*1026 The Board, in contrast, argues that even if the rates enacted by the Board are found to be excessive and therefore unreasonable, there is no common law or statutory right to a refund. The Board contends that rates set by the Board, acting in its legislative capacity, may be collected until there is a judicial determination that the rates are unreasonable. If such a determination is made, the effect would be prospective only.
Durbin argues that this Court should distinguish between regulated and unregulated utilities. The former group, Durbin concedes, which is governed by the statutory regulations for the operation of the Alabama Public Service Commission, is not required to make refunds if a rate is later determined to be unlawful unless specific supersedeas procedures have been followed. Code 1975, § 37-1-125; Foshee v. General Telephone Co. of the Southeast, 295 Ala. 70, 322 So.2d 715 (1975). Customers of the latter group, Durbin argues, have no statutory protection from unreasonable rates and therefore, Durbin says, this Court should order that all rates found to be excessive should be refunded to the ratepayers.
We are of the opinion that Durbin is entitled to a refund of all rates for municipal utility services which were improperly imposed (i.e., the sewer surcharges) or which were unreasonable (the gas rates). We find the case of utilities not regulated by the APSC to be distinguishable from that of regulated utilities:
"A consumer may sue to recover damages at common law resulting from discrimination by a utility as to services or rates. These are private rights which belong to the individuals constituting the public to whom the `holding out' of the business is made. St. Clair Borough v. Tamaqua & Pottsville Electric R. Co., 1918, 259 Pa. 462, 103 A. 287, 5 A.L.R. 20; Lewis v. Mayor and City Council of Cumberland, 1946, 189 Md. 58, 54 A.2d 319; Columbia Baking Co. v. Atlanta Gas Light Co., 1948, 78 Ga.App. 241, 50 S.E.2d 382; 43 Am.Jur., Public Utilities and Services, §§ 30, 33, 67, pp. 592, 594, 615; 73 C.J.S., Public Utilities, § 30, p. 1051." Foltz v. City of Indianapolis, 234 Ind. 656, 670, 130 N.E.2d 650, 657 (1955). See also, Lewis v. Mayor and City Council of Cumberland, 189 Md. 58, 54 A.2d 319 (1947). This common law right admittedly does not extend to utilities regulated by the APSC.
To hold otherwise would create a situation where a utility could set a clearly unreasonable, even exorbitant, rate and collect it during a prolonged period of litigation and then be relieved of the duty to refund the amounts collected. Of course, in this declaratory judgment action, the right to recover unreasonable rates would be limited by the equitable doctrine of laches. We are also convinced that a utility customer should be required to give the rate making body notice that the rates are being paid under protest before a refund can be ordered in an action contesting those rates. In determining whether a ratepayer would be barred by laches from challenging municipal utility rates, the Supreme Court of New Jersey considered that "prior and subsequent to the passage of the resolution and ordinance in question prosecutor [the ratepayer], and others similarly affected, frequently conferred with the city fathers to the end of reaching a mutually satisfactory rate to all concerned." P.J. Ritter Co. v. Mayor of City of Bridgeton, 135 N.J.L. 22, 50 A.2d 1, 4 (N.J.1946). See also, E. McQuillin, Municipal Corporations, Volume 12, § 35.37K (3rd ed. 1970). We therefore remand this issue for a determination of whether Durbin promptly notified the Board that the rates were being paid under protest and for a determination of whether Durbin's action is barred by laches.

RELEASE OF BONDS
The Board also appealed in this case from an order of the trial court releasing two bonds posted by Durbin pursuant to A.R. Civ.P. 65(c). That rule provides:
"Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs, damages, and reasonable attorneys fees *1027 as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained; provided, however, no such security shall be required of the State of Alabama or of an officer or agency thereof, and provided further, in the discretion of the court, no such security may be required in domestic relations cases."
Durbin posted three bonds under this provision. The first was for $50,000.00 and was posted in June 1977 and cancelled in April 1981. The release of this bond is not at issue here. The second bond was for $250,000.00 and was posted in August 1979. The third bond was for $215,000.00 and was posted in April 1981. The trial court in August 1981 entered an order on the merits and vacated the injunctions. In December 1981, Durbin filed a motion to release the security which, following a hearing, was granted on March 1, 1982. The Board appeals from this release of security by the trial court. The Board contends that the purpose of the bond is to secure indemnification for costs incurred in opposing the injunction, including attorney fees, court costs, costs of depositions, damages for being wrongfully enjoined, and loss of the use of the money that would have been collected if the new rate structure had not been enjoined.
Durbin maintains that Rule 65 only requires security for payment of costs and damages which a party incurs by virtue of having been "wrongfully enjoined or restrained."
In the case before us, the trial court specifically found that the Board had not been wrongfully enjoined and therefore released the security, implicitly disallowing any recovery by the Board for any damages flowing from the issuance of the injunctions.
Thus, there are, in fact, two issues presented: first, whether the Board was wrongfully enjoined; and second, if so, the damages which have been occasioned by the injunctions. Since we hold that the Board was not wrongfully enjoined, we pretermit consideration of the second issue.
In order for a party to be liable on the bond posted pursuant to Rule 65(c), the court must find that the party had been "wrongfully" enjoined. The mere fact that an injunction has been vacated is not conclusive as to whether or not an injunction was "wrongfully" issued. In Union Springs Telephone Co. v. Green, 47 Ala.App. 427, 430, 255 So.2d 896, 899 (1971), the Court of Civil Appeals discussed this rule:
"If it has been judicially determined that a temporary injunction was rightfully issued, though subsequently dissolved, dismissed or discharged, there is no right of recovery in a suit on the bond. Jones v. Ewing, et al., 56 Ala. 360; Satellite Broadcasting Co. v. Tingley, 286 Ala. 571, 243 So.2d 677; U.S.F. & G. Co. v. Int. Bro. of Teamsters, [41 Ala.App. 114, 125 So.2d 526 (1960)]."
We agree with this analysis. Thus, the vacation of the injunction did not, in and of itself, establish that the injunction was wrongfully issued.
An award of damages pursuant to a security bond is discretionary. "The award of damages pursuant to an injunction bond rests in the sound discretion of the court's equity jurisdiction." H. & R. Block, Inc. v. McCaslin, 541 F.2d 1098, 1099 (5th Cir.1976). We cannot say that the trial court abused that discretion in the case before us. The Alabama rule is virtually identical to the Federal rule, F.R.Civ.P. 65(c). This rule was discussed in Page Communications Engineers, Inc. v. Froehlke, 475 F.2d 994 (D.C.Cir.1973). In that case Page brought an action against the Department of the Army to enjoin performance under a contract awarded to a third party. Page posted a bond pursuant to F.R.Civ.P. 65(c). Page lost on the merits of the lawsuit; however, the district court refused to award damages under the injunction bond to the Department of the Army. The Department of the Army appealed the district court's decision not to award damages pursuant to F.R.Civ.P. 65(c). In upholding the trial court's action, the D.C. Circuit Court stated that even *1028 where an injunction is wrongfully issued, damages are not necessarily mandated:
"Although Rule 65(c) required a bond here, it does not follow that the District court was bound to award damages on the bond, without considering the equities of the case. The Rule did not make judgment on the bond automatic, upon a showing of damage. On the contrary, the court in considering the matter of damages was exercising its equity powers, and was bound to effect justice between the parties, avoiding any result that would be inequitable or oppressive for either party. The Rule was not intended to negate the court's duty in this regard. Thus, we hold that the court had discretion to refuse to award damages, in the interest of equity and justice."
475 F.2d at 997.
In reaching its conclusion the federal court had considered whether the lawsuit was frivolous, whether the questions involved were already clearly defined and free of ambiguity, and whether the lawsuit had been fairly and honestly pursued. See also, Russell v. Farley, 105 U.S. 433, 26 L.Ed. 1060 (1881).
After reviewing the case before us, we are convinced that the trial court was correct in holding that the Board was not wrongfully enjoined, since the case involved issues of crucial importance to both of the parties and questions of constitutional rights not previously adjudicated. Thus, the order of the trial court releasing the security was correct under the circumstances of this case.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MADDOX, FAULKNER, ALMON, SHORES, EMBRY and BEATTY, JJ., concur.
ADAMS, J., concurs in the result.
JONES, J., dissents.
JONES, Justice (dissenting).
I respectfully dissent from that portion of the majority's opinion regarding the appropriate standard of review. I would treat that issue thusly:
Durbin contends, in brief, that certain significant distinctions between the Board and the APSC are relevant to the standard of review issue:
"First, the APSC establishes or approves the rates to be charged by a regulated utility. The Jasper Board establishes its own rates. Second, a regulated utility is required, by statute, to charge the rates established by the APSC. The Board charges whatever rates it promulgates and can change those rates at will. Third, a regulated utility must charge the rates established by the APSC until the APSC, through its own action or through judicial review, modifies that rate schedule. As stated, the Board can, at will and with no restraint, modify and increase rate schedules at any time.
". . . .
"In contrast with an unregulated utility, the Alabama legislature has enacted specific provisions[1] with regard to grievances by both the utility or a consumer when a utility is regulated by the APSC....
". . . .
"Therefore a distinction of paramount importance between regulated and unregulated utilities is the fact that the consumers of an unregulated utility have no statutory protection from unreasonable and unlawful rates."
Altough I agree with Durbin's contention that differences between a municipal utility board and the APSC warrant application of a broader standard of review by the trial court, my rationale and focus in reaching this conclusion are somewhat different from those espoused by Durbin. Unlike the APSC, a municipal utility board does not stand in an impartial position to judge the fairness and validity of the very rates it sets. When the Supreme Court, as *1029 a court of initial appellate jurisdiction under our direct appeal statute,[2] reviews rate orders of the APSC, it is reviewing orders of a quasi-judicial body that stands independent from the provider of the service and in the position of an impartial arbiter between ratepayers and ratechargers.
Conversely, when a circuit court, as a court of initial jurisdiction, reviews the propriety of rates set by a municipality, it is not reviewing the decision of an independent, impartial arbiter of rate schedules. Therefore, the same presumption of correctness afforded the APSC's order pursuant to Code 1975, § 37-1-124, should not apply to an order of a municipal board serving in the dual capacity as provider of the services and as judge of the fairness of the rates charged for such services.
Our cases, to be sure, stand for the proposition that a municipal utility board can, in effect, wear two hatsthat is, set utility rates, as does the APSC, while operating the utility as a proprietary enterprise. See Mitchell v. City of Mobile, 244 Ala. 442, 13 So.2d 664 (1943). But, on close analysis, one finds what is referred to as the board's jurisdiction, or authority, to perform both functions. Municipal utility boards are created pursuant to legislative authority, and are statutorily authorized "[t]o fix and revise from time to time and charge and collect rates, fees, and charges for the use of or for the services and facilities furnished by any system operated by the board." Code 1975, § 11-50-343(a)(8). In exercising this statutorily prescribed authority, the board performs a public function, acting as a ratemaking body, while at the same time performing a proprietary function as owner and operator of the utility.
In Mitchell, supra, the Court discussed the role of municipal rate-making bodies:
"Neither this provision, nor other law in Alabama, forbids the city or town fixing rates upon municipal utilities on the same basis permitted to privately owned utilities.
". . . .
"While in the ownership and operation of a utility, the city is engaged in a proprietary enterprise; in prescribing lawful rates, the governing body acts in a legislative capacity. In both capacities, the governing body is the chosen agency of the people of the city and subject to their control through democratic processes." 244 Ala. at 445, 13 So.2d 664.
Concerning judicial review, Mitchell further stated:
"Rate-making is a legislative, not a judicial function. The Courts cannot directly nor indirectly make rates. If rates fixed by legislative acts, orders of Public Service Commission, or municipal ordinances, are confiscatory or so greatly excessive as to violate constitutional rights, the courts have jurisdiction to so declare, and by proper orders protect the party aggrieved until lawful rates are fixed by legislative authority." 244 Ala. at 446, 13 So.2d 664.
It is one thing to say that a municipal utility board, acting in its legislative capacity, apart from its proprietary function of providing the utility services, has authority to set rates for those services. When the fairness of these rates is challenged, however, it is quite a different thing to say that, because of this authority, the board is able to impartially judge the fairness and validity of its self-imposed rates, and thereby entitle the board's findings to a presumption of correctness.
I would hold that the trial court, in order to satisfy minimal due process guarantees, must exercise a broad standard of review when examining the legal validity of rates imposed by a municipal utility board, and must accord no presumption of correctness to the board's order resulting from a contest of the rates fixed by the board. No citation of authority is necessary to support the elementary proposition that fundamental substantive due process is lacking where the findings of the very entity that provides the utility services are accorded a presumption of correctness by the reviewing court. Because there is no statutorily created independent *1030 dispute-resolving agency with quasi-judicial authority, the initial reviewing court, according to constitutional due process mandates, must provide a de novo hearing. The conventional presumption of correctness will be accorded the trial court's findings of fact, of course, when reviewed by an appellate court.
To summarize, I do not quarrel with the majority's position that the utility board exercises a legislative function in setting rates for utility services. My quarrel with the majority centers around its failure to recognize the distinction between the Board's rate-setting prerogative and its quasi-judicial function of testing the fairness of those rates when challenged by a ratepayer. Fundamental due process guarantees mandate that, when a utility board exercises this quasi-judicial function, the findings of that board cannot be accorded a presumption of correctness, but, instead, are subject to a de novo review by the court of initial jurisdiction.
I now turn to the issue whether this review standard, compelled by reason and logic, was applied by the trial court. The trial judge's final order, quoted in the majority opinion, clearly shows the judge misconstrued his role in the review process, and utilized an incorrect, overly-narrow scope of review in his examination of the evidence. For this reason, I would remand this cause to the trial court for further findings consistent with the broader standard of review I have urged in this dissent.
Any discussion of other issues addressed by the majority would be premature at this time. I would retain jurisdiction, however, to decide these and other issues that may arise after the trial court's disposition of this case in conformity with the principles I have previously discussed. Accordingly, I would remand this cause for further proceedings, with or without further evidentiary hearings in the discretion of the trial court.
NOTES
[1] See § 37-1-120, et seq.
[2] Code 1975, § 37-1-140.