The plaintiffs, John and Shirley McCausland, filed a complaint in the Mobile Circuit Court against the defendants, Tide-Mayflower Moving and Storage ("Tide") and Aero Mayflower Transit Company ("Aero") in October 1985. The complaint alleged causes of action in detinue, conversion, breach of contract, and fraud. In September 1985, Aero and Tide moved for summary judgment on all counts. This motion was granted in November 1985. The McCauslands appeal. We affirm in part, reverse in part, and remand.
The standard for summary judgment is well-settled and was stated in Silk v. Merrill Lynch, Pierce, Fenner Smith,Inc., 437 So.2d 112, 114 (Ala. 1983), as follows:
 "The standard for summary judgment as set forth in Rule 56, Ala.R.Civ.P., has two basic parts: the trial court must determine (1) that there is no genuine issue of material fact, and (2) that the moving party is entitled to judgment as a matter of law. Houston v. McClure, 425 So.2d 1114, 1116 (Ala. 1983). Furthermore, this standard is conjunctive. Houston v. McClure, supra; McGuire v. Wilson, 372 So.2d 1297 (Ala. 1979). The burden is upon the moving party to clearly show that there is no genuine issue of a material fact, and all reasonable doubts concerning the genuine issue of material *Page 1380 
fact must be resolved against the moving party. Fountain v. Phillips, 404 So.2d 614, 618
(Ala. 1981); Butler v. Michigan Mut. Ins. Co., 402 So.2d 949, 951 (Ala. 1981). The burden is further increased by the scintilla evidence rule, which requires that summary judgment not be granted if there is a scintilla of evidence supporting the position of the non-movant. Fountain v. Phillips, supra; Browning v. Birmingham News, 348 So.2d 455
(Ala. 1978)."
Viewing the facts in the light most favorable to the McCauslands, we find that the record shows the following: In July 1981, John McCausland contracted with Aero to move his household goods by truck from Coral Gables, Florida, to Mobile, Alabama. A bill of lading was issued to McCausland, and the goods were shipped to Mobile. When the goods arrived at their destination, however, the McCauslands, who were apparently experiencing financial difficulties, failed to pay the charges that were due. The Aero driver refused to deliver the goods to the McCauslands and, after waiting for several days, he deposited the goods with Aero's local agent, Tide. Shortly thereafter, the McCauslands went to Florence, Kentucky, to live with Mrs. McCausland's mother. Although the parties corresponded regarding the transit charges, the charges were never paid. In June 1982, Tide was instructed by Aero to sell the McCauslands' property at auction. On June 8, 1982, Sandra Hall, the owner and manager of Tide, sent a letter, by certified mail, to the McCauslands in care of Mrs. McCausland's mother in Kentucky. This letter read, in pertinent part, as follows:
 "Due to nonpayment of storage charges, relating to household goods and personal effects we have stored for you, we are hereby serving notice, in accordance with Code of Alabama 1940, Title 2, Section 538, of our intention to exercise our lien for these charges. Attached is an itemized statement of our claim showing the amount due at this time. Charges are for our service in connection with the household goods and personal effects which we have stored for you as shown on the inventory copy of which has been furnished you.
 "We are hereby demanding that our claim for $3,946.53 and any further claims as shall accrue, shall be paid on or before June 14, 1982.
 "In the event our claim is not paid within the above specified time, the goods will be advertised for sale and sold by auction at our warehouse on June 16, 1982."
Hall also placed a classified advertisement entitled "Notice of Sale" in the June 13, 1982, edition of the Mobile PressRegister. This advertisement stated that the used household goods and personal belongings of the McCauslands would be sold at public outcry to the highest bidder on June 16, 1982, at Tide's offices to pay the lien held on those goods. The auctioneering firm of Bunch Bunch was hired to handle the auction. Bunch Bunch placed two of its own advertisements in the newspaper, which ran on June 13 and 15, 1982.
The goods were sold at auction on June 16, 1982. The proceeds from this sale were applied to the outstanding balance on the McCauslands' shipping charges, storage charges for the period July 14, 1981, to June 16, 1982, the cost of advertising the sale and notifying the McCauslands, and the labor charges which Tide incurred in moving the McCauslands' goods out to the auction platform.
Although the testimony indicated that the certified letter set out above did reach the McCauslands in Kentucky shortly after it was sent on June 8, 1982, the exact date of receipt is not clear. However, it is clear that the letter was not opened until at least a week after its receipt. After reading the letter, John McCausland called Tide and learned that his furniture had been sold. This action followed.
The McCauslands argue that summary judgment as to their first three counts (detinue, conversion, and breach of an agreement to maintain the McCauslands' property until it was reclaimed) was improper *Page 1381 
because a genuine issue of material fact existed. Specifically, they argue that, because their goods were stored subsequent to shipment, a material issue of fact exists as to whether Tide and Aero, through Tide's agency, had become warehousemen. If they had become warehousemen, the McCauslands' argument continues, then the lien on their goods could only be exercised pursuant to §§ 7-7-209, -210, Code of 1975. These sections create and set out the statutory requirements for the enforcement of a warehouseman's lien.
For their part, Tide and Aero argue that the goods were "stored" only because of the McCauslands' failure to pay the shipping charges due. This storage, they argue, was only incidental to the enforcement of their carrier's lien pursuant to §§ 7-7-307, -308, Code of 1975.
We cannot accept the McCauslands' argument that the storage of their household goods subsequent to shipment, in and of itself, creates a genuine issue of fact which would make the granting of a summary judgment improper. This is because it is undisputed that no warehouse receipt covering the goods was ever issued. Even if it could be determined that either Tide or Aero had been a "warehouseman" under the definition provided in § 7-7-102(h), on the facts of the present case, that issue is simply not material.
Section 7-7-209(1) provides in part:
 "A warehouseman has a lien against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or transportation (including demurrage and terminal charges), insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law." (Emphasis added.)
While there are no Alabama cases directly on point, it is clear from the plain language of § 7-7-209(1) (emphasized above) that a statutory warehouseman's lien can be created only upon those goods which are covered by a warehouse receipt. Other courts, in jurisdictions with statutes containing similar language, have reached the same conclusion. See, e.g.,Richwagen v. Lilienthal, 386 So.2d 247 (Fla.Dist.Ct.App. 1980); Dathar Corp. v. Lemkin, 14 U.C.C. Reporting Service 1207 (N.Y.Sup.Ct. 1974). See generally Hawkland, Alderman Schneider, UCC Series § 7-209:01 (Art. 7) (1986).
As the facts in the present case make clear, this rule is logical. Without the requirement of a warehouse receipt, anytime a carrier that was also in the business of storing goods for hire (see § 7-7-102(h), Code of 1975) attempted to enforce its carrier's lien, it would be unable to do so. Instead, it would have to proceed under those statutes which allow for the creation and enforcement of a warehouseman's lien. See §§ 7-7-209, -210, Code of 1975. However, a carrier who was not also engaged in the business of storing goods for hire would be able to proceed with the enforcement of its carrier's lien. This result, as already explained, would be contrary to the intent of the legislature as it is expressed in the plain language of the applicable statutes. See Ex parteHolladay, 466 So.2d 956 (Ala. 1985).
Having determined that the trial court correctly concluded that Tide and Aero were not required to proceed under those statutes which set out the procedures for the enforcement of a warehouseman's lien, we must now decide if it also correctly determined that the actions taken by Tide and Aero comport with those requirements set out by the legislature for the enforcement of a carrier's lien.
Section 7-7-308(1), Code of 1975, reads:
 "A carrier's lien may be enforced by public or private sale of the goods, in block or in parcels, at any time or place and on any terms which are commercially reasonable, after notifying all persons known to claim an interest in the goods. Such notification must include a statement of the amount due, the nature of the proposed sale and the time and place of any public sale. The fact that a better *Page 1382 
price could have been obtained by a sale at a different time or in a different method from that selected by the carrier is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the carrier either sells the goods in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with commercially reasonable practices among dealers in the type of goods sold he has sold in a commercially reasonable manner. A sale of more goods than apparently necessary to be offered to ensure satisfaction of the obligation is not commercially reasonable except in cases covered by the preceding sentence."
The McCauslands do not argue that the sale of their household goods was not conducted in a "commercially reasonable" manner. Neither do they argue that the "form" of the notice of intent to sell given them by Tide and Aero was inadequate. Instead, they argue only that the "timing" of this notice was not commercially reasonable. On their part, Tide and Aero argue that, because § 7-7-308 does not expressly require "reasonable notice," they were required to give only actual notice of their intent to sell the McCauslands' household goods. We cannot agree with this latter argument.
Even though § 7-7-308 does not expressly require that "reasonable notice" be given before sale, it does expressly state that the "lien may be enforced by public or private sale of the goods, in block or in parcels, at any time or placeand on any terms which are commercially reasonable, afternotifying all persons known to claim an interest in thegoods." (Emphasis added.) We construe this language to require that not only must the "terms" under which the goods are sold be commercially reasonable; but that so must the "time" and "place" at which the goods are sold, after those persons known to claim an interest in the goods have been notified, be commercially reasonable. Specific to the case at bar, we hold that the time period between the notification of sale and the sale itself must be "commercially reasonable."
While what is "commercially reasonable" must necessarily depend upon the facts and circumstances of each case, cf.Gigandet v. Third National Bank of Nashville,333 So.2d 557 (Ala. 1976), it is clear that not every sale made after actual notice will be commercially reasonable.
Under § 7-7-308(2), "any person claiming a right in the goods may pay the amount necessary to satisfy the lien and the reasonable expenses incurred under this section." If these charges are paid, then "the goods must not be sold, but must be retained by the carrier subject to the terms of the bill and this article."
Subsections 7-7-308(1) and (2) are in pari materia.
Therefore, those subsections should be construed together to ascertain the meaning and intent of each. McDonald'sCorporation v. DeVenney, 415 So.2d 1075 (Ala. 1982). In arriving at a determination of the legislature's intent, a statute should be examined as a whole and, if possible, every section should be given effect. Employees' RetirementSystem of Alabama v. Head, 369 So.2d 1227 (Ala. 1979);Tillman v. Sibbles, 341 So.2d 686 (Ala. 1977).
If only actual notice by a carrier of his intent to sell was necessary, it is clear that this notice could be given at any time prior to the sale. Under such a construction, a carrier could easily exercise his rights under § 7-7-308(1) in such a way as to cut off the right of a person claiming an interest in these goods to stop the sale by making payment under §7-7-308(2). Such a result was not intended by the legislature.
In the present case, the defendants have introduced no evidence on the issue of the commercial reasonableness of the timing of the notice given to the McCauslands of their intent to sell their property pursuant to § 7-7-308(1). In fact, they have argued that such was not at issue in this case. On their part, the McCauslands have argued *Page 1383 
that the timing of the notice was unreasonable.
The burden was upon Tide and Aero as the moving parties on summary judgment to show that no genuine issue of material fact existed. Silk v. Merrill Lynch, Pierce, Fenner Smith,Inc., supra. Because they have failed to do this, the trial court's summary judgment in their favor was improper. As to the detinue, conversion, and breach of contract issues, the judgment of the trial court is reversed. We now consider the propriety of the summary judgment as to the fraud count.
In their fourth count, the McCauslands alleged that, on October 12, 1981, Sandra Hall, d/b/a Tide, individually and as Aero's agent, "represented to the plaintiffs that the defendants would move and store the plaintiffs' personal property, would maintain that property while in storage, and would make the property available to the plaintiffs upon their request."
In their motion for summary judgment, Tide and Aero argued that no such representation was ever made by Sandra Hall. In support of that assertion, they introduced the deposition of John McCausland. We quote the pertinent section of that deposition:
 "Q. You and your wife through your lawyers have contended that [Aero] and Tide made misrepresentations to you.
 "What representations do you contend were made to you that were misrepresented; what facts were misrepresented to you?
 "A. I'd really have to talk to Dennis [plaintiff's counsel] at this point to see exactly what we're talking about.
 "Q. What representations were made to you by [Aero] and Tide regarding the moving and storage of your property?
 "A. Well, my impression was that they would continue to store the goods.
 "Q. Did anyone from [Aero] or Tide tell you that?
 "A. Well, not explicitly. But I believe that their, you know, their course of behavior and course of action, I was quite justified in believing that.
 "Q. All right. Tell me specifically any other representations that were made to you that you contend were in fact misrepresentations, any other statements made to you by [Aero] or Tide which you contend were misrepresentations?
 "A. At this time I don't recall anything further.
 "Q. Do you contend or do you know of any intentional misrepresentations by [Aero] or Tide?
 "MR. KNIZLEY: I object to the form of the question.
 "A. Well, of course, you know, I have no way of knowing what's intentional and what's a misrepresentation.
 "All I know is that representations may have been made.
"MR. CALLAWAY:
 "Q. Do you know of any promise made to you by [Aero] or Tide which [Aero] or Tide made with intent to defraud and intent not to perform the promise?
 "MR. KNIZLEY: I object to the form of the question.
 "A. Well, it seems to me that the representation was made to continue storing the goods and not to dispose of the goods until either I finished paying or they went through whatever other proper procedure there was.
"MR. CALLAWAY:
 "Q. When and how was this representation made?
 "A. I think it was an implicit representation established during the course of dealing.
"Q. It was never explicitly expressed?
 "A. I'm not sure that it wasn't at this time. I don't remember.
"Q. Are you going to remember at another time?
"A. Possibly. You know, it could be — *Page 1384 
 "Q. You're a lawyer, you've been through this before. You're saying you've sued us for fraud, what's the fraud?
"MR. KNIZLEY: I object to the form.
 "A. It could be that my memory will be refreshed by my wife in the future or somebody else.
"MR. CALLAWAY:
"Q. And you're saying that constitutes fraud?
"MR. KNIZLEY: I object to the form.
 "A. I'm saying that any fraud involved would, of course, have been representing one thing and doing another.
"MR. CALLAWAY:
 "Q. But no express representations were made?
 "A. None that I recall at this time." (Emphasis added.)
The McCauslands did not introduce any evidence, by affidavit or otherwise, to support their allegation that Sandra Hall had made any representation to them concerning the storage of their household goods.
Mere silence is not fraud, unless confidential relations or special circumstances exist; active concealment or misrepresentation must be present. Berkel Co.Contractors, Inc. v. Providence Hospital, 454 So.2d 496
(Ala. 1984). See § 6-5-102, Code of 1975.
To prevent summary judgment, after the movant has prima facie shown himself to be entitled to judgment as a matter of law, the opposing party must show by admissible evidence that a genuine issue of material fact exists which requires resolution by the factfinder. Horner v. First National Bank ofMobile, 473 So.2d 1025 (Ala. 1985). See Rule 56(e), A.R.Civ.P. Because the McCauslands have not met this burden as to their count in fraud, on that issue the summary judgment is affirmed.
In light of the foregoing, the summary judgment is affirmed as to the fraud count, but reversed as to the other counts, and the cause is remanded to the trial court for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
TORBERT, C.J., and MADDOX, ALMON and HOUSTON, JJ., concur.