The defendants, Lauderdale County ("County") and the State of Alabama ("State"), seek review of the Court of Civil Appeals' judgment reversing a summary judgment entered by the trial court in favor of the County and the State. We reverse and remand.
On April 14, 1987, the Lauderdale County Commission ("Commission") authorized Waste Contractors, Inc. ("WCI"), to operate a solid waste landfill near Zip City in northern Lauderdale County (hereinafter referred to as the "Greenbrier site").
On that date, without conducting a hearing, the Commission adopted the following resolution:
 "THEREFORE BE IT RESOLVED that the Lauderdale County Commission does hereby grant Waste Contractors permission to establish and operate a landfill in Lauderdale County provided:
 "1) all rules and regulations as promulgated by the State Health Department, State of Alabama, have been met in the establishment of and in the operation of said landfill,
 "2) no toxic waste will be disposed of in the proposed sanitary landfill located in Lauderdale County, and
 "3) Waste Contractors will pay to Lauderdale County a fee equal to 1% of gross revenue generated by the operation of this landfill, with a minimum of $20,000 annually, for the purpose of helping defray cost of maintaining county roads.
 "BE IT FURTHER RESOLVED that this authorization given Waste Management to establish a sanitary landfill is confined to the location as described in metes and bounds attached to this resolution and made a part of this resolution."
WCI subsequently filed a request to expand the size of the landfill, which was granted by a resolution of the Commission on May 11, 1987, again without a hearing.
On June 22, 1987, the Commission, without a hearing, rescinded both resolutions.
In July 1987, WCI, pursuant to § 22-27-5(b), Code of Alabama
1975, filed a formal permit application with the Alabama Department of Environmental Management ("ADEM").
On August 10, 1987, the Commission adopted "License Requirements for Sanitary Landfills," intended to apply to landfills not yet in operation.
WCI filed suit against Lauderdale County on August 21, 1987, alleging that the Commission was powerless to rescind its original approval, that WCI's rights to due process were violated, and, by subsequent amendment to the suit, that §22-27-5(b) was unconstitutional because of a failure to *Page 625 
provide specific guidelines or standards for the Commission to follow in determining whether a landfill request should be granted.
At the hearing on its motion for summary judgment, the trial court ruled in favor of the defendants. The Court of Civil Appeals reversed and remanded. We have granted the writ of certiorari to review that reversal.
The issues here are whether the Solid Wastes Disposal Act, Code 1975, § 22-27-1 et seq., is unconstitutionally vague and capricious because of a failure to establish specific guidelines and criteria for county or local governments to follow in the issuance of waste permits; whether the Commission violated WCI's due process rights in failing to hold hearings on WCI's applications; whether the Commission had the authority to approve or disapprove WCI's application; and whether the Commission exceeded the authority granted to it by statute when it established licensing requirements for sanitary landfills.
The Solid Wastes Disposal Act ("Act"), Code 1975, § 22-27-1
et seq., permits county and municipal governments, with the concurrence of the health department and the approval of ADEM, to make available to the public collection and disposal facilities for solid wastes. It authorizes those governmental entities, either directly or through contract with private agencies, to collect and dispose of solid wastes, subject to approval by ADEM and the state and/or county boards of health.
The Act provides that if a governmental entity undertakes the responsibility of providing disposal services to the general public and does so by contracts and mutual agreements for disposal of solid wastes then those agreements are reviewable by the affected state or county health officer and subject to cancellation upon 30 days' notice from that officer, with the concurrence of ADEM, if the contracts or agreements are found not to be in the best interests of the health, safety, and welfare of the affected citizenry.
The Act does authorize governing bodies to assign territories and to approve or disapprove disposal sites.
Thus, under the Act, the process for establishing solid waste collection and disposal sites begins with the county or local governmental entity having control over the affected area. That entity is authorized to approve or disapprove sites with the concurrence of the appropriate health department and ADEM. Therefore, before a private corporation, individual, or governing body can establish a site under the Act, it must first have the approval of the local government, and then the approval of both the health department and ADEM.
The Court of Civil Appeals held the Act to be unconstitutional, writing:
 "[Because] the grant of power to local governing bodies to approve or disapprove sites that presently exists in § 22-27-5(b)[1] is totally devoid of standards to regulate the exercise of that power, we find that portion of the Solid Wastes Disposal Act to be unconstitutional.
 "We emphasize that not all of the powers granted to local authorities by § 22-27-5(b) are unconstitutional. It is the lack of standards and safeguards governing local approval or disapproval of waste disposal sites that makes the provision invalid."
565 So.2d at 621.
That court analogized § 22-27-5 to the Minus Act,[2] which was declared unconstitutional *Page 626 
in Browning-Ferris Industries of Alabama v. Pegues,710 F. Supp. 313 (M.D.Ala. 1987). In that case, the federal district court wrote:
 "The constitutional vice of the Minus Act is the complete absence of standards. There simply are no guidelines spelled out in the provision that the legislature must individually approve any facility devoted solely to the storage of hazardous waste. In other words, the statute does not provide the faintest clue as to what an applicant should do or refrain from doing in order to secure legislative approval. If one applicant for a license is preferred over another as the result of a political favor or for no logical reason at all, the disappointed applicant is without redress under the Minus Act because the discretion of the Legislature is standardless and boundless."
Upon review, we find that the act here in question is distinguishable from the Minus Act and does not, in fact, suffer from a complete absence of standards.
A statutory scheme like that set forth in the Act for the approval or disapproval of disposal sites must be viewed as a whole in determining whether it provides adequate standards. See McCausland v. Tide-Mayflower Moving Storage,499 So.2d 1378, 1382 (Ala. 1986). As noted above, a county or local government cannot, without certain approvals, provide a solid waste collection and disposal facility. Any contract or agreement entered into by a governmental entity is reviewable by the health department and by ADEM. Consequently, any governmental entity undertaking to provide such services would likely consider health department and ADEM standards when it considers a request for approval of a site. Furthermore, under the Act no site can be permitted unless it is found to be in the best interests of the health, safety, and welfare of the affected citizenry.
The Act requires any agency contracting with the governmental entity to have the capability to service assigned territories, to pay annual license fees, to set rate schedules where appropriate, and to post a performance bond satisfactory to the governing body.
The Act not only requires that any license issued by a local government have the approval of the health department and ADEM; it further requires that the licensed agency also obtain separate permits from both the health department and ADEM. Code 1975, § 22-27-5(c). Those permits are renewable annually and are subject to revocation for failure to perform under the provisions of the Act. Again, it is fair to assume that a licensing government would look to the standards for the issuance of permits by the health department and ADEM in determining whether to grant the initial license.
Pursuant to the Act, the health department is required to enforce sanitary requirements for the collection of solid wastes and ADEM is required to exercise regulatory control over the disposal of solid wastes. It should, therefore, be obvious to the licensing entity that any license issued must comply with health department collection regulations and ADEM disposal regulations.
What then are the standards by which a governmental entity reviews an application for a license to operate a collection and disposal facility? The list would include, but not necessarily be limited to, the following:
(1) The licensee must meet those standards set by the health department and ADEM that will be utilized to review the license, if approved.
(2) The proposed collection and disposal application must be in the best interests of *Page 627 
the citizenry, taking into account its health, safety, and welfare.
(3) The licensee must be able to adequately service a designated or assigned area.
(4) The licensee must pay an annual license fee and a permit fee, if required, and must post a performance bond in an amount to be set by the governmental entity.
(5) The license must agree to function with predetermined rate schedules set by the licensing authority.
(6) Upon approval of a license application, the licensee must meet the standards set by the health department and ADEM in order to obtain permits from them.
(7) The licensee must meet all health department sanitary regulations for collection of solid wastes.
(8) All disposal plans must comport with ADEM disposal regulations.
As can be seen from the foregoing, the Act is far from standardless and, in fact, gives local and county governments much guidance in formulating reasonable standards to utilize in the licensing process established by the Act. Furthermore, when this Court construes a statute that is intended to protect the public health, "'great latitude should be allowed to the legislature in determining the character of such laws, and how, when, and by whom, in their practical administration, they should be applied.'" State v. Clayton, 492 So.2d 665, 667
(Ala.Cr.App. 1986), quoting Parke v. Bradley, 204 Ala. 455,456, 86 So. 28 (1920). Because one of the purposes of the Act is to protect the public health, the legislature, in selecting a method to guide the counties in policing this public interest, will be accorded great latitude by this Court.
We therefore find that the Act is not unconstitutional, and we conclude that the judgment of the Court of Civil Appeals on this point was in error.
The next issue raised by WCI relates to the method by which the Commission disapproved its license after initially approving it. WCI argues that its due process rights were violated when the Commission rescinded its prior approval without a hearing. Procedural due process is not properly afforded when one's life, liberty, or property interests are affected without prior notice and an opportunity for a hearing.Mullane v. Central Hanover Bank Trust Co., 339 U.S. 306,310-11, 70 S.Ct. 652, 656-57, 94 L.Ed. 865 (1950). It is interesting to note that in this case WCI received the initial license without a hearing, but it does not argue that that
violated due process. If WCI's due process rights were violated by the subsequent revocation of the license without a hearing, then certainly the due process rights of the affected citizenry were violated when the license was first issued without a hearing.
We agree with the Court of Civil Appeals in its conclusion that WCI's due process rights were violated, but we must further state that the original license should not have been issued without notice and an opportunity for a hearing.
As to WCI's argument that the Commission lacked the authority to approve or disapprove WCI's application, we find that it did not. It is clear from the Act that no waste collection and disposal site, unless specifically excepted by the Act, could legally operate without a license issued by a county or other local governmental entity. Although there are other approvals that must be obtained, unless an agency is excepted, it cannot operate without approval of the appropriate governmental agency. Accordingly, we reverse the Court of Civil Appeals' judgment as to this issue.
Several weeks after the Commission rescinded approval of the Greenbrier site, it adopted "License Requirements for Sanitary Landfills."[3] WCI argued that the *Page 628 
Commission was without authority to do so, and that, even if it had authority to do so, those requirements were arbitrary and capricious.
On that point, the Court of Civil Appeals stated:
 "The county's requirements also provide that a license 'shall not be approved . . . unless a permit for the sanitary landfill has been issued by [ADEM].' § 5, paragraph (a), p. 6, 'License Requirements for Sanitary Landfills.' Under this provision, WCI and companies like it would be required to select a site that fulfills ADEM's requirements and complete the permitting process before knowing whether they could obtain the county's approval for the site. Disapproval of a site at that stage would inflict substantial economic harm upon such companies. In addition, the county's $10,000 application fee, over six times greater than the permit fee required by ADEM, is at least arbitrary and capricious, if not prohibitive."
565 So.2d at 622.
We disagree. The language of the license requirements merely presumes the dual role between the county and ADEM as set forth in the Act. The Act itself does not specify a schedule that applicants must follow when seeking approval of a collection and disposal site. Thus, the Commission did not exceed its authority by requiring that, prior to its licensing of a site, an ADEM permit must be procured. Whether approval first comes from the county or from ADEM, it is a virtual certainty that any applicant would suffer some economic harm if the second agency should nullify the first agency's approval. Such is the risk that accompanies the permit process established by the Act.
Finally, there was no evidence offered that would lend credence to a conclusion that permit fees as established by the Commission were "at least arbitrary and capricious, if not prohibitive." Such a determination could be made only by examining the total annual revenues expected to be derived by WCI from the operation of the landfill site. It is conceivable that this application fee would, indeed, be found to be reasonable should such an examination take place. Without such evidence before this Court, we will not decide whether the fee was arbitrary or capricious. Chatman v. City of Prichard,431 So.2d 532, 533 (Ala. 1983). Accordingly, we reverse the judgment of the Court of Civil Appeals with regard to the licensing requirements adopted by the Commission, and we conclude that they are not inconsistent with the Act.
The judgment of the Court of Civil Appeals is reversed, and the cause is remanded.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, ALMON, SHORES, ADAMS, HOUSTON, and STEAGALL, JJ., concur.
JONES, J., not sitting.
[1] Section (b) of the Act reads as follows:
"(b) Private or corporate agencies. — Individuals, corporations, partnerships or other agencies engaging in the collection and disposal of solid wastes are subject to this article. Governing bodies may assign territories, approve or disapprove disposal sites, with the concurrence of the health department, and shall establish and collect annual license fees from such firms and set rate schedules if a service fee is charged. In addition to any other approvals which are necessary for any contract between private or corporate agencies and governmental entities for the disposal of solid wastes, approval of the department shall be obtained."
[2] Before it was amended effective April 12, 1988, the Minus Act, Code 1975, § 22-30-5.1, read as follows:
"(a) The term 'hazardous waste' shall mean the same as defined by section 22-30-3(5).
"(b) There shall be no more than one commercial hazardous waste treatment facility or disposal site as defined by subdivisions (3) and (15) of section 22-30-3 situated within any one county of the state. Provided, however, no commercial hazardous waste treatment or disposal site not in existence on or before November 19, 1980, shall be situated without resolution giving approval therefore. Provided, however, legislative approval shall not be required for industries with on site treatment, storage, and disposal of their own hazardous wastes."
[3] In pertinent part, the license requirements read as follows:
"Section 5. Location Factors
"(a) A license shall not be approved by the County Commission unless a permit for the sanitary landfill has been issued by the Alabama Department of Environmental Management.
". . . .
"Section 7. Fees, License Renewal and Revocation
"(a) The applicant for a license to construct and operate a sanitary landfill shall pay an application fee of $10,000 to the County Commission to defray the costs of renewing such application. Such fee shall accompany the application. Provided that the County shall not be required to pay an application fee for any sanitary landfill that it owns or operates.
"(b) The owner or operator of an approved sanitary landfill shall apply for license renewal annually. Provided, however, that the County shall not be required to reapply for any sanitary landfill that it owns or operates. The annual renewal fee shall be equal to 10% of the gross receipts of the landfill during the previous year, but shall not exceed a maximum of $50,000 per year. At the time of renewal application, the Commission shall review the performance record of the owner or operator during the previous year and may deny the license renewal based upon poor performance, including any violations of the Alabama Solid Waste Management Regulations." *Page 629