THOMAS, Judge.
 

 In December 2000, the City of Athens (“the City”) hired Shaun Chandler as a service installer for the City’s water-distribution system. At the time Chandler was hired, he was not yet certified as a Grade I Distribution System Operator (“Grade I operator”). In fact, when Chandler was hired, the City intended to train Chandler for certification as a Grade I operator. Chandler was certified as a Grade I operator on or about November 1, 2002, and he was promoted to the position of construction technician later that month. On December 3, 2003, Chandler resigned his position with the City and became employed by the Water and Wastewater Board of the City of Madison (“the Board”) as a pipe fitter.
 

 The City notified the Board by letter in March 2004 that it claimed an entitlement to reimbursement under Ala.Code 1975, § 22-25-16, which permits the State, a municipality, a municipal utility board, or a county to seek reimbursement for the total amount that that entity expended to enable a water operator or wastewater operator to become certified from another state, municipality, municipal utility board, or county who employs that operator within 24 months of his or her certification. The statute reads, in its entirety:
 

 
 *243
 
 “In those instances in which a water or wastewater operator of any municipality, municipal utility board, county, or the state is employed by the State of Alabama, any county, municipality, or another municipal utility board, within 24 months after completing the certification requirements mandated by this chapter, the total expense paid by the water or wastewater operator’s governmental employer to enable the operator to become certified, including, but not limited to, salary paid during training, transportation costs paid to the trainee for travel to and from the training facility, room, board, tuition, overtime paid to other employees who fill in for the trainee during his or her absence, and any other related training expenses, shall be reimbursed to the municipality, municipal utility board, county, or the state which paid for the training. The municipality, municipal utility board, county, or the state which paid for the training shall submit an itemized sworn statement to the new employer of the water or wastewater operator, as the case may be, shall demand payment thereof, and may enforce collection of the obligation through civil remedies and procedures. The terms Vater operator’ and ‘waste-water operator’ shall have the same meanings as in Section 22-25-1.”
 

 § 22-25-16. Although the City provided the required itemized statement, the Board refused to pay the City.
 

 On March 10, 2005, the City sued the Board, seeking a judgment declaring that the City was entitled to reimbursement from the Board for the expenses associated with Chandler’s training and certification as a Grade I operator, pursuant to § 22-25-16. The City further sought reimbursement from the Board of the $62,594.53 the City claimed it had expended in training Chandler to be certified as a Grade I operator. After answering the complaint, the Board sought a summary judgment in May 2006, which was denied. In January 2008, the City moved for a summary judgment, which the Board opposed. After considering the materials submitted by both parties, the trial court entered a summary judgment in favor of the City and ordered the Board to reimburse the City $62,298.15. The Board appealed to the Alabama Supreme Court, which transferred the appeal to this court, pursuant to Ala.Code 1975, § 12-2-7(6).
 

 We review a summary judgment de novo; we apply the same standard as was applied in the trial court. A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing “that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law.” Rule 56(c)(3);
 
 see Lee v. City of Gadsden,
 
 592 So.2d 1036, 1038 (Ala.1992). If the movant meets this burden, “the burden then shifts to the nonmovant to rebut the movant’s prima facie showing by ‘substantial evidence.’ ”
 
 Lee,
 
 592 So.2d at 1038 (footnote omitted). “[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.”
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989);
 
 see
 
 Ala.Code 1975, § 12-21-12(d). Furthermore, when reviewing a summary judgment, the appellate court must view all the evidence in a light most favorable to the nonmovant and must entertain all reasonable inferences from the evidence that a juiy would be entitled to draw.
 
 See Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C.,
 
 792 So.2d 369, 372 (Ala.
 
 *244
 
 2000); and
 
 Fuqua v. Ingersoll-Rand Co.,
 
 591 So.2d 486, 487 (Ala.1991).
 

 On appeal, the Board makes three arguments for reversal. The Board first argues that, based on
 
 Limestone County Water and Sewer Authority v. City of Athens,
 
 896 So.2d 531 (Ala.Civ.App.2004), § 22-25-16 does not apply to it because it is a public corporation, having been incorporated pursuant to Ala.Code 1975, § 11-50-310 et seq. Secondly, the Board asserts that Chandler was not a water “operator” as that term is defined in Ala.Code 1975, § 22-25-1. Finally, the Board argues that, if we conclude that it is subject to § 22-25-16 and that Chandler is a water operator as defined in § 22-25-1, the City was not entitled to the amount that the trial court ordered reimbursed because of the specific language pertaining to the training expenses to be reimbursed in § 22-25-16. We will consider each argument in turn.
 

 I. Whether § 22-25-16 Applies to the Board
 

 The Board argues that it is not “the State of Alabama, any county, municipality, or another municipal utility board,” § 22-25-16, and, therefore, that the City may not seek reimbursement under § 22-25-16 for Chandler’s training expenses. According to the Board, it is a public corporation incorporated pursuant to § 11— 50-310 et seq. and, thus, is a distinct legal entity from the municipality it serves.
 
 See Water Works Bd. of Leeds v. Huffstutler,
 
 292 Ala. 669, 677, 299 So.2d 268, 276 (1974) (adopting the order of the trial court, which stated that a water board was “ ‘an entity separate and independent from the city which it serves’ ”);
 
 City of Mobile v. Cochran,
 
 276 Ala. 530, 532, 165 So.2d 81, 83 (1964) (stating that a municipal corporation and a public corporation like a waterworks board are “distinct, separate and independent corporations”). Because of its independence and status as a public corporation, the Board contends, it cannot be considered to be within the class of entities to which § 22-25-16 applies.
 

 Although it is without question that the Board is not the State or a county, the question whether it qualifies as a municipality or municipal utility board is more challenging to answer. As our supreme court has recognized, “ ‘[tjhere has been considerable confusion over the existence and legal status of public corporation utilities, primarily because the reported cases are inconsistent in their analysis. It is possible to find a public corporation utility case to support almost any pi*oposition....’”
 
 Water Works & Sewer Bd. of Talladega v. Consolidated Publ’g, Inc.,
 
 892 So.2d 859, 862 (Ala.2004) (quoting the ami-cus curiae brief of the State of Alabama). This is indeed the case.
 

 The Board is a public corporation organized for the purpose of operating a water system for the City of Madison.
 
 See
 
 § 11-50-311 (explaining the procedure by which a public corporation is created, including the filing of an application with the governing body of the municipality and the adoption of a resolution approving the incorporation by the municipality) and § 11-50-312(a)(1) (indicating that the articles of incorporation of the corporation should “indicat[e] the system or systems for the operation of which the corporation is organized (e.g., ‘the waterworks and electric board of the City (or Town) of.,’ or ‘the utilities board of the City (or Town) of.’ ”)). As noted, the Board maintains that, as a public corporation that is separate and independent from the municipality it serves, it is not an agency of the municipality and is therefore not required to reimburse the City pursuant to § 22-25-16 because it does not fall into the class
 
 *245
 
 of entities to which that statute applies, i.e., it is not a municipality or a municipal utility board.
 

 However, despite the language in cases like
 
 Huffstutler
 
 and
 
 Cochran
 
 regarding the separate and independent nature of public corporations, our supreme court has also long held that, in at least some respects, a public corporation like the Board is an agency of the municipality it serves,
 
 Cochran,
 
 276 Ala. at 532, 165 So.2d at 83;
 
 Jackson v. Hubbard,
 
 256 Ala. 114, 120, 53 So.2d 723, 728 (1951), or acts as an agent of the municipality.
 
 Marshall Durbin & Co. v. Jasper Utils. Bd.,
 
 437 So.2d 1014, 1019 (Ala.1983), overruled on other grounds by
 
 Ex parte Waterjet Sys., Inc.,
 
 758 So.2d 505, 511 (Ala.1999). In more recent cases, the supreme court has referred to a public corporation like the Board as “an administrative agency that performs city functions” and has noted that such a public corporation “is so organized to perform its functions as an agency of the City.”
 
 City of Montgomery v. Water Works & Sanitary Sewer Bd. of Montgomery,
 
 660 So.2d 588, 594 (Ala.1995).
 

 Based on these conclusions, the supreme court has determined that the phrase “municipal board, committee, or like body” used in Act No. 93-704, Ala. Acts 1993, encompassed an entity like the Board in the present case, “irrespective of the fact that the ... Board is a public corporation.”
 
 City of Montgomery,
 
 660 So.2d at 594. At issue in
 
 City of Montgomery
 
 was whether the phrase “municipal board, committee, or like body” in Act No. 93-704, which was applicable to Class 3 municipalities like the City of Montgomery, would include a water and sewer board.
 
 Id.
 
 at 590. Act No. 93-704 permits a Class 3 municipality to change the number of members of a “municipal board, committee, or like body” to be equal with the number of members on the governing body of the municipality.
 
 Id.
 
 The Water Works and Sanitary Sewer Board of Montgomery sought, among other things, a judgment declaring that Act No. 93-704 did not apply to it because it was a public corporation and, therefore, independent from the City of Montgomery.
 
 Id.
 
 at 593. The City of Montgomery, however, contended that, because the board was appointed by the governing body of the municipality, it should logically be considered a “municipal board.”
 
 Id.
 
 at 592.
 

 The supreme court considered persuasive the fact that the language used by the legislature in Act No. 93-704 — “municipal board, committee, or like body” — was broad and indicated its intent to legislate broadly.
 
 Id.
 
 at 594. As noted above, the court commented that boards like the Water Works and Sanitary Sewer Board of Montgomery had been considered agencies of the municipalities they served and that they were organized to perform functions as agencies of the municipalities.
 
 Id.
 
 at 594. The court further noted that the fact that an agency is organized as a corporation would not impact its qualities as a government agency.
 
 Id.
 
 In conclusion, the court stated that the language used in Act No. 93-704 compelled a conclusion that the legislature meant to include “any instrumentality by which a city performs its governmental functions.”
 
 Id.
 
 Thus, the court held that Act No. 93-704 did permit the City of Montgomery to change the number of members on the Water Works and Sanitary Sewer Board of Montgomery.
 
 Id.
 

 The Board argues that the language in § 22-25-16 is not as broad as the language in Act No. 93-704. Although the language in § 22-25-16 regarding the entities to which that statute applies does not include a phrase indicating a broad scope like the phrase “or like body” in Act No. 93-704, we cannot agree that the failure of the legislature to include that phrase or a simi
 
 *246
 
 lar phrase in § 22-25-16 is conclusive as to whether the Board in the present case falls within the ambit of § 22-25-16.
 

 Likewise, the conclusion of this court in
 
 Limestone County Water & Sewer Authority
 
 does not conclusively resolve the issue in favor of the Board. Although we determined in
 
 Limestone County Water & Sewer Authority
 
 that a county water authority incorporated pursuant to Ala.Code 1975, § 11-88-1, was not required to reimburse the City of Athens because § 22-25-16 did not apply to the county water authority, we did so in large part because the county water authority, as a public corporation, was not a part of the
 
 State. Limestone County Water & Sewer Auth.,
 
 896 So.2d at 534. The precise question presented here — whether the Board is a “municipal utility board” as that term is used in § 22-25-16 — was not answered by
 
 Limestone County Water & Sewer Authority.
 
 Using the myriad of cases reflecting the seemingly opposed views on the character of public corporations, we will endeavor to determine whether the Board is a “municipal utility board” and, therefore, falls within the purview of the § 22-25-16.
 

 This task would be much easier if § 22-25-16, or for that matter, any statute, defined the term “municipal utility board.” However, no statute defines that term. Instead, the City argues that the Board is indeed a municipal utility board based on certain language in one Alabama Supreme Court case,
 
 Marshall Durbin & Co.,
 
 437 So.2d at 1018, and the use of the term in the title of H.B. 36, a 2001 bill proposing to amend Ala.Code 1975, § 11-50-313.
 
 [1]
 
 The Board argues t.hat the use of the term “municipal utility board” in the title of H.B. 36 is an “inadvertent use” of the term and points out that the language in § 11-50-313 refers to the entities created under § 11-50-310 et seq. consistently as “corporations.”
 

 Although the article pursuant to which the Board was created — Title 11, Chapter 50, Article 9 (§ 11-50-310 et seq.) — refers to the creation of public corporations and uses the term “corporation” to refer to the entities created pursuant to that article, we note that the statutes composing the article seem to indicate that the public corporations created thereby are, in fact,
 
 boards
 
 that provide utility services to a municipality. Notably, § 11-50-312(a)(1) requires that the name of the public corporation “indicat[e] the system or systems for the operation of which the corporation is organized,” i.e., the wastewater board or the water and gas board, and the examples listed in that section show that the name of the corporation should include the term “board” and specify the particular city or town the corporation serves.
 
 Id.
 
 As already noted earlier in this opinion, in order to incorporate, the public corporation must secure a resolution from the governing body of the municipality it intends to serve. § 11-50-311. In addition, any amendment to the certificate of incorporation of the public corporation must also be approved by the municipality’s governing body via a resolution consenting to the proposed amendment. § 11 — 50—312(b).
 

 Despite the City’s argument, we do not find the use of the term “municipal utility board” by our supreme court in
 
 Marshall Durbin & Co.,
 
 437 So.2d at 1018, to be authority for concluding that entities like the Board are “municipal utility boards.” Although the City characterizes that opinion as “acknowledging” that the Jasper
 
 *247
 
 Utilities Board was a municipal utility board, that characterization appears to be a bit strong. The supreme court did use the term “municipal utility board” in explaining the arguments of the parties, but it appears that the parties were not disputing whether the Jasper Utilities Board was a municipal utility board; the opinion does not go so far as to define that term, so the use of that term in that opinion is of little help to us in determining whether the Board in the present case is a “municipal utility board” as that term is used in § 22-25-16. However,
 
 Marshall Durbin & Co.
 
 does indicate that a board in the position of the Board in the present case is an agent of the municipality it serves,
 
 id.
 
 at 1019, and the opinion further notes the uniqueness of a public corporation incorporated under § 11-50-310 et seq., including the fact that the governing body of the municipality has some control over those appointed to be members or directors of the board.
 
 Id.
 

 More recent cases considering the characterization of a public corporation like the Board appear to focus on the role of the public corporation created under § 11-50-310 et seq. — to serve the municipality that created it.
 
 Consolidated Publ’g,
 
 892 So.2d at 863.
 

 “Public corporations were initially authorized by the Legislature as a means for municipalities to finance improvements to their utilities infrastructure without running afoul of constitutional and statutory debt limitations, as well as to shield municipalities from the large financial obligations that often accompany such utilities projects.
 
 Coxe v. Water Works Bd. of Birmingham,
 
 288 Ala. 332, 337, 261 So.2d 12, 15-16 (1972). Yet public corporations have typically maintained close relationships with the municipalities that create them.”
 

 Id.
 
 at 861. The
 
 Consolidated Publishing
 
 court considered whether the records of the Water Works and Sewer Board of the City of Talladega (“the Talladega Board”) were subject to Ala.Code 1975, § 36-12-40, a part of the Open Records Act.
 
 Id.
 
 Like the Board in the present case, the Talladega Board was organized under § 11-50-310 et seq.
 
 Id.
 
 The court focused its analysis on whether the Talladega Board’s employees were officers or servants of a municipality.
 
 Id.
 
 at 863. The court first noted that the Talladega Board’s members were appointed by the Talladega City Council.
 
 Id.
 
 The court further noted that the Talladega Board “performs a municipal function, namely, supplying water and sewer services to the residents of Talladega.”
 
 Id.
 
 The supreme court then stated that, based on their performance of municipal functions, public corporations “have long been held to be agencies of the municipality they serve, regardless of their organizational structure.”
 
 Id.
 
 Based on its determination that the Talladega Board “has the qualities of an agency of the City of Talladega,” the court determined that the employees of the Talladega Board were public employees.
 
 Id.
 
 Although the court did not construe the term “municipal utility board” and was not construing § 22-25-16, the court’s view of public corporations like the Board is enlightening.
 

 Finally, we note that the Court of Criminal Appeals has held that the Prichard Water Works and Sewer Board (“the Prichard Board”) is a “utility board.”
 
 Langham v. State,
 
 662 So.2d 1201, 1205 (Ala.Crim.App.1994). The
 
 Langham
 
 court was examining whether members of the Prichard Board were public officials under the state ethics laws.
 
 Langham,
 
 662 So.2d at 1203. As part of its analysis, the court considered a former version of § 36-25-1(11), which had defined “public official” to include “members of ... utility boards.”
 
 *248
 
 The court concluded, therefore, that the members of the Prichard Board were public officials subject to the state ethics laws, stating:
 

 “After examining the ‘original’ definition of ‘public official,’ we hold that the Prichard Water Works and Sewer Board, regardless of whether it is a creature of incorporation or whether it was established by city ordinance, is a ‘utility board’ and, thus, subject to the state ethics law.
 

 “Because both enactments, § 11-50-310 et seq. and § 11-50-340 et seq., are codified within the ‘public utilities’ Chapter of the Alabama Code, and because the legislature clearly expressed its intent that ‘utility boards’ be subject to the ethics law, no error occurred here.”
 

 Id.
 
 at 1205.
 

 Although we agree that the Board is a public corporation and although we cannot escape the conclusion that it is a corporation separate and independent from the municipal corporation that is the City of Madison, our analysis of the caselaw leads us to conclude that the Board is a “municipal utility board” as that term is used in § 22-25-16. The Board was incorporated under § 11-50-310 et seq., which required it to be created by a resolution of the governing body of the City of Madison. Its purpose, as revealed by its full name— the Water and Wastewater Board of the City of Madison — is to provide a water and wastewater system for the City of Madison. Because our caselaw has long held that public corporations like the Board are “agencies of the municipality they serve, regardless of their organizational structure,”
 
 Consolidated Publ’g,
 
 892 So.2d at 863, we agree with the City and the trial court that the Board is subject to § 22-25-16.
 

 II. Whether Chandler Is an Operator as Defined in § 22-25-1
 

 The Board next challenges the application of § 22-25-16 to it because, it argues, Chandler is not an “operator” as defined in § 22-25-1. Section 22-25-1(4) defines an “operator” as “[t]he person on duty who has direct responsibility for the operation of a water treatment plant, water distribution system, public wastewater collection system, or wastewater treatment plant.” The Board argues that this definition was intended to apply only to those employees employed in a supervisory capacity. The City, however, argues that the statutory definition does not require that Chandler be considered a supervisor, only that he have the ability to be responsible for the operation of the water-distribution system, which, the City says, his Grade I operator certificate permits him to do at those times when he is “on call” or when he is the most senior person on his crew.
 

 To further bolster its argument that Chandler is not an “operator” under § 22-25-1, the Board quotes Ala. Admin. Code (Dep’t of Envtl. Mgmt.), Rule 335-10-1-.02, which gives a more comprehensive definition of an “operator”:
 

 “(h) ‘Operator’ means the person on duty who has direct responsibility for the operation of a water treatment plant, water distribution system, public waste-water collection system or wastewater treatment plant. A person shall be deemed to have direct responsibility for the operation of a water treatment plant, water distribution system or wastewater treatment plant if he in fact supervises or directs the operation of a water treatment plant, water distribution system or wastewater treatment plant, or makes process control decisions.”
 

 Although the Board does not include the definition of “process control decision” in its brief, we find that definition to be perti
 
 *249
 
 nent to the decision whether Chandler is, in fact, an operator so as to require the Board to pay the City for the cost of his certification.
 

 “(k) Process control decision means a decision regarding the daily operational activities of a water system or wastewa-ter system that will directly impact the quality and/or quantity of drinking water or treated wastewater.”
 

 Rule 335-10-1-.02.
 

 The parties do not dispute the fact that Chandler was not, at any time during his employment, a supervisor in the ordinary sense, i.e., he did not supervise other employees. The deposition testimony of John Stockton and the deposition testimony of Howard Hopkins offered in support of the City’s motion for a summary judgment explained the process by which an employee working in the City’s water-distribution system becomes certified as a Grade I operator. According to Stockton, the manager of Water Services for the City, each person employed by the City to work in its water-distribution system is hired with the expectation that they will complete the training necessary to become a Grade I operator. Without a Grade I operator certification, Stockton explained, an employee of the City working in its water-distribution system cannot “function in any kind of useful responsible position.” Before an employee is certified, he or she can work with a crew; however, Stockton explained, he or she cannot “operate the system” without the supervision of a certified coworker.
 

 According to Stockton, certification as a Grade I operator permits an employee to:
 

 “Operate the system. Perform what we call operating the system. The critical operative word is ‘breaching1 the system. A potable water system is pressurized and it is protected by that pressure....
 

 “The system is pressurized. Every time you open a valve, open the spigot in your house, you breach the system. You can do that because we are not accountable after it goes through the meter into your house. But until it passes through that meter, we are accountable for what goes on and the State requires us to have certified operators on that system to breach it.... [I]f they are closing or opening a valve for any reason, if they are working on a leak, if they are making a tap, if they are replacing a meter they are breaching the system.”
 

 Stockton further explained the change in an employee’s status after the employee’s certification as a Grade I operator, stating that the employee is then able to be “on call” to handle, without supervision, any after-hours emergencies that might occur. As Stockton explained:
 

 “[W]e have someone in responsible charge 24 hours a day, 366 [sic] days a year. [A certified Grade I operator] can join that group of people [that can be ‘on call’ or on ‘standby’] because prior to certification, he comes in every day, he gets in the track and goes out with his leader and he does what he is told to do.”
 

 The deposition testimony of Hopkins, who is the superintendent of the City’s water-distribution system, was similar to Stockton’s testimony. He testified that an employee was not permitted to “breach the system” unless the employee was certified as a Grade I operator. He further explained that, after Chandler’s certification, during the times that Chandler was “on call,” Chandler would be considered the operator of the water-distribution system.
 

 
 *250
 
 The evidence indicates that, in order to breach the water system, an employee must be a certified Grade I operator. Chandler was permitted to breach the system without supervision because he had acquired the necessary certification. The responsibility of making decisions regarding after-hours emergencies that would require breaching the system fell to Chandler on those days when he was “on call.” Those type of decisions are “process control decisions.” Rule 335-10-1-.02(k) (“a decision regarding the daily operational activities of a water system or wastewater system that will directly impact the quality and/or quantity of drinking water or treated wastewater”). We conclude, therefore, that Chandler was an “operator” under § 22-25-1(4) and Ala. Admin. Code, Rule 335-10-1-.02(h).
 

 III. Whether the Board Must Reimburse All the Expenses Associated with Chandler’s Grade I Operator Certification
 

 The Board’s final argument concerns the scope of the reimbursement permitted under § 22-25-16. According to the Board, that statute requires reimbursement of only those expenses related to formal or classroom training provided by the City during Chandler’s certification process, or, at most, $938.74. The Board bases its position, in part, on what we perceive to be a rather disingenuous argument regarding the 2002 amendment to § 22-25-16.
 

 The version of § 22-25-16 in effect before the 2002 amendment read as follows:
 

 “In those instances in which a water or wastewater operator of any municipality, municipal utility board, county, or the state is employed by the State of Alabama, any county, municipality, or another municipal utility board, within 24 months after completing the certification requirements mandated by this chapter, the total expense paid by the water or wastewater operator’s governmental employer to enable the operator to become certified,
 
 including salary paid during training,
 
 shall be reimbursed to the municipality, municipal utility board, county, or the state which paid for the training. The municipality, municipal utility board, county, or the state which paid for the training shall submit an itemized sworn statement to the new employer of the water or waste-water operator, as the case may be, shall demand payment thereof, and may enforce collection of the obligation through civil remedies and procedures. The terms ‘water operator’ and ‘wastewater operator’ shall have the same meanings as in Section 22-25-1.”
 

 (Emphasis added.)
 

 The 2002 amendment to § 22-25-16 added the words “but not limited to” before the phrase “salary paid during training” and added “transportation costs paid to the trainee for travel to and from the training facility, room, board, tuition, overtime paid to other employees who fill in for the trainee during his or her absence, and any other related training expenses” after that phrase. Based on those changes, the Board inexplicably argues that the legislature intended to restrict the expenses to be reimbursed under § 22-25-16 to only those expenses related to “specific formal training outside the regular course of employment.” Board’s brief at 35-36. We cannot understand how insertion of the phrase “but not limited to” can be construed to limit the amount of reimbursement to only those items in the statute that follow that phrase.
 
 See, e.g., McCulloch v. State Dep’t of Human Res.,
 
 536 So.2d 68, 70 (Ala.Civ.App.1988) (referring to the legislature’s provision of a “nonexclusive list” in Ala.Code 1975, § 26-18-7, which contains the phrase “may con
 
 *251
 
 sider, but not be limited to”). The Board’s proposed interpretation is, in fact, contrary to the principles of statutory construction, which require us to give each word in a statute its “natural, plain, ordinary, and commonly understood meaning.”
 
 Tuscaloosa County Comm’n v. Deputy Sheriffs’ Ass’n of Tuscaloosa County,
 
 589 So.2d 687, 689 (Ala.1991).
 

 Be that as it may, we can certainly understand the remainder of the Board’s argument — that it should not be required to pay Chandler’s salary, including all applicable taxes, from December 2000 to November 2002, the two years immediately preceding his certification as a Grade I operator. The City, however, contends that the language of § 22-25-16 clearly mandates payment of the “total expense” it incurred to “enable” Chandler to become certified over the two-year period during which he trained on-the-job before his certification. The phrase “salary paid during training” is capable of either construction urged by the parties; however, we are required, as best we can, “to ascertain the intent of the legislature as expressed and to effectuate that intent.”
 
 Tuscaloosa County Comm’n,
 
 589 So.2d at 689. To determine the legislative intent behind a statute, a court may consider “the language used, the reason and necessity for the act, and the purpose sought to be obtained by its passage.”
 
 Id.
 

 The act that was initially codified as § 22-25-16, Act No. 96-626, Ala. Acts 1996, contains little in the way of explanation of the impetus behind the act other than that it its purpose is to provide reimbursement of “training costs.” The title to Act No. 96-626 reads:
 

 “To amend Section 36-21-7, Code of Alabama 1975, relating to the reimbursement of mandated training costs when one governmental entity employs certain employees from another governmental entity within a certain period, and to provide similar requirements for the reimbursement of training expenses for certain governmental employees.”
 

 Section 36-21-7, to which Act No. 96-626 refers, was apparently the first of the reimbursement statutes; it was enacted in 1980 by Act No. 80-729, Ala. Acts 1980, to provide for the reimbursement to the original employing entity of expenses associated with training a law-enforcement officer when the officer was employed by a different municipality or county or by the State after completing his or her training requirements. We have reviewed the title to Act No. 80-729, hoping to glean additional information regarding the legislative intent behind the acts requiring reimbursement of training expenses; it reads, in pertinent part: “To require reimbursement to the municipality, county and state which expended public funds for the training of law enforcement officers if such officers are employed by another state, county or municipal agency within twelve months after completion of the training.” Thus, the focus of the reimbursement acts appears to be to replace public funds expended by one entity when another entity reaps the benefits of the employee’s training.
 

 The title to the 2002 act amending § 22-25-16, Act No. 2002-424, Ala. Acts 2002, contains wording similar to the wording in the title to Act No. 96-626, while also noting that the amendment intended “to further provide what expenses are reimbursable.” We can reason from the language used in the titles to all three acts that the legislature recognized that training, whether it be of law-enforcement officers or water operators, required the original employing entity to invest a significant amount of time and money in an employee as he or she trained to become certified or qualified for his or her position. Thus, by enacting § 22-25-16 the legislature ap
 
 *252
 
 pears to have intended to provide reimbursement of that significant expense to the training employer on those occasions when a water operator moves to another specified employer within 24 months of his or her certification.
 

 The key portion of the statute requires reimbursement of the following:
 

 “the total expense paid by the water or wastewater operator’s governmental employer to enable the operator to become certified, including, but not limited to, salary paid during training, transportation costs paid to the trainee for travel to and from the training facility, room, board, tuition, overtime paid to other employees who fill in for the trainee during his or her absence, and any other related training expenses.”
 

 § 22-25-16. The City relies on the following emphasized portions of the statute: “the
 
 total expense
 
 paid by the water ... operator’s governmental employer
 
 to enable the operator to become certified,
 
 including, but not limited to .... ” Based on those emphasized portions, the City reasons that the “total expense ... to enable the operator to become certified” would include every single expense, including the salary of the employee while the employee was seeking his or her certification. In making its argument that the operator’s salary is part of the amount that is to be reimbursed under § 22-25-16, the City relies in large part on the regulations that require an operator to have “at least twelve months working experience” in a water system before he or she can submit an application for certification as an operator. Ala. Admin. Code (Dep’t of Envtl. Mgmt.), Rule 335-10-1-.08(a). Thus, the City reasons, the salary paid to an employee who is seeking certification is part of the expense paid to enable that employee to become certified.
 

 The Board, however, counters with the above-described argument that the legislature intended to restrict the amount subject to reimbursement by adding to the term “salary paid during training” the other items enumerated in the amended statute: “transportation costs paid to the trainee for travel to and from the training facility, room, board, tuition, overtime paid to other employees who fill in for the trainee during his or her absence, and any other related training expenses.” Those terms and the language used in § 22-25-16, contends the Board, indicate that the amount of reimbursement should be related to actual formal or classroom training away from the job site, which both parties agree amount to approximately 45 hours in this case. The Board also argues that, had the legislature intended that all compensation paid to an employee be reimbursed, it could have used language to that effect in § 22-25-16.
 

 However, in our view, the language in § 22-25-16 is not so limited as to require reimbursement of only those expenses related to formal or classroom training, because the statute also includes as reimbursable the “total expense paid by the ... employer to enable the operator to become certified .... ” We must give effect to all the language used within the statute.
 
 Ex parte Uniroyal Tire Co.,
 
 779 So.2d 227, 236 (Ala.2000) (quoting
 
 Sheffield v. State,
 
 708 So.2d 899, 909 (Ala.Crim.App.1997)) (“ ‘ “There is a presumption that every word, sentence, or provision [of a statute] was intended for some useful purpose, has some force and effect, and that some effect is to be given to each, and also that no superfluous words or provisions were used.” ’ ”). In addition, we note that, as the City argues, the legislature could well have used more specific and limiting language in § 22-25-16 had it intended that only salary and training expenses attributable to actual formal or classroom training be reimbursed.
 

 
 *253
 
 We note that neither party refers in its argument to the definition of the term “trainee,” which appears in § 22-25-1(6). That section defines “trainee” as “[t]he person on duty who has direct responsibility for the operation of a water treatment plant, water distribution system, public wastewater collection system, or wastewa-ter treatment plant and
 
 is serving in a training capacity for a maxim,um of one year without a certificate.”
 
 (Emphasis added.) This section appears consistent with the language used in Ala. Admin. Code, Rule 335-10-1-.08(a), which requires an employee to have 12 months of on-the-job experience before he or she can seek certification as an operator. Section 22-25-1(6), then, appears to limit the time an employee may be a trainee, i.e., perform the functions of an operator without certification, to a 12-month period.
 

 Section 22-25-16 allows reimbursement for the expenses related to training an employee to become an operator; that statute refers to the training of the employee and uses the term “trainee” when describing certain items paid to the employee that are reimbursable expenses. Based on our consideration of the definition of “trainee” in § 22-25-1(6) and the language of § 22-25-16,
 
 see Ex parte Jackson,
 
 614 So.2d 405, 406 (Ala.1993) (quoting
 
 McCausland v. Tide-Mayflower Moving & Storage,
 
 499 So.2d 1378, 1382 (Ala.1986) (“Subsections of a statute are in pari materia and ‘should be construed together to ascertain the meaning and intent of each.’ ”)), a logical reading of § 22-25-16 leads to the conclusion that reimbursement of the operator’s salary and related training expenses under § 22-25-16 is restricted to the period of one year, during which the employee is considered a trainee. We have concluded therefore that, pursuant to § 22-25-16, the City is due to be reimbursed Chandler’s salary and training expenses for only one year of the two years that he was employed by the City before his certification as a Grade I operator — i.e., only for the period during which he was a trainee. Accordingly, we reverse the summary judgment insofar as it orders the Board to reimburse the City $62,298.15.
 

 IV. Conclusion
 

 In conclusion, we have determined that the Board is a municipal utility board and that Chandler is an operator under § 22-25-1(4). Therefore, the Board is subject to § 22-25-16 and is required to reimburse the City for its expenses relating to Chandler’s training and certification. We affirm the trial court’s judgment insofar as it reached the same conclusion. However, because the language of § 22-25-16, when read in conjunction with § 22-25-1(6), does not support the City’s argument that the Board is required to reimburse it for two years of Chandler’s salary, we must reverse the summary judgment awarding the City $62,298.15 on its claim for reimbursement under § 22-25-16.
 

 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.
 

 [1]
 

 . Although § 11-50-313 was amended in 2001, it was
 
 not
 
 amended by H.B. 36; instead, the legislature enacted Act. No. 2001-1094, Ala. Acts 2001, which originated as S.B. 6. Notably, the title to Act. No. 2001-1094 does not contain the term "municipal utility board.”